## SHELLEY ET UX. *v.* KRAEMER ET UX.

NO. 72.

Argued January 15–16, 1948.—Decided May 3, 1948.

*George L. Vaughn* and *Herman Willer* argued the cause and filed a brief for petitioners in No. 72. *Earl Susman* was also of counsel.

*Thurgood Marshall* and *Loren Miller* argued the cause for petitioners in No. 87. With them on the brief were *Willis M. Graves, Francis Dent, William H. Hastie, Charles H. Houston, George M. Johnson, William R. Ming, Jr., James Nabrit, Jr., Marian Wynn Perry, Spottswood W. Robinson, III, Andrew Weinberger* and *Ruth Weyand.*

By special leave of Court, *Solicitor General Perlman* argued the cause for the United States, as *amicus curiae,* supporting petitioners. With him on the brief was *Attorney General Clark.*

*Gerald L. Seegers* argued the cause for respondents in No. 72. With him on the brief was *Walter H. Pollmann. Benjamin F. York* was also of counsel.

*Henry Gilligan* and *James A. Crooks* argued the cause and filed a brief for respondents in No. 87. *Lloyd T. Chockley* was also of counsel.

Briefs of *amici curiae* supporting petitioners were filed by *Perry W. Howard* for the Civil Liberties Department, Grand Lodge of Elks, I. B. P. O. E. W.; *Isaac Pacht, Irving Hill* and *Clore Warne; Robert McC. Marsh* and *Eugene Blanc, Jr.* for the Protestant Council of New York City; *Herbert S. Thatcher* and *Robert A. Wilson* for the American Federation of Labor; *Julius L. Goldstein* for the Non-Sectarian Anti-Nazi League to Champion Human Rights, Inc.; *Melville J. France* for the General Council of Congregational Christian Churches et al.; *Robert W. Kenny, O. John Rogge* and *Mozart G. Ratner* for the National Lawyers Guild; *Lee Pressman, Eugene Cotton, Frank Donner, John J. Abt, Leon M. Despres, M. H. Goldstein, Isadore Katz, David Rein, Samuel L. Rothbard, Harry Sacher, William Standard* and *Lindsay P. Walden* for the Congress of Industrial Organizations et al.; *Phineas Indritz, Irving R. M. Panzer* and *Richard A. Solomon* for the American Veterans Committee; *William Maslow, Shad Polier, Joseph B. Robison, Byron S. Miller* and *William Strong* for the American Jewish Congress; *Joseph M. Proskauer* and *Jacob Grumet* for the American Jewish Committee et al.; *William Strong* for the American Indian Citizens League of California, Inc.; *Francis M. Dent, Walter M. Nelson, Eugene H. Buder, Victor B. Harris, Luther Ely Smith* and *Harold I. Kahen* for the American Civil Liberties Union; *Earl B. Dickerson, Richard E. Westbrooks* and *Loring B. Moore* for the

4

National Bar Association; *Alger Hiss, Joseph M. Proskauer* and *Victor Elting* for the American Association for the United Nations; and *Edward C. Park* and *Frank B. Frederick* for the American Unitarian Association.

Briefs of *amici curiae* supporting respondents were filed by *Roger J. Whiteford* and *John J. Wilson* for the National Association of Real Estate Boards; *Ray C. Eberhard* and *Elisabeth Eberhard Zeigler* for the Arlington Heights Property Owners Association et al.; and *Thomas F. Cadwalader* and *Carlyle Barton* for the Mount Royal Protective Association, Inc.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

These cases present for our consideration questions relating to the validity of court enforcement of private agreements, generally described as restrictive covenants, which have as their purpose the exclusion of persons of designated race or color from the ownership or. occupancy of real property. Basic constitutional issues of obvious importance have been raised.

The first of these cases comes to this Court on certiorari to the Supreme Court of Missouri. On February 16, 1911, thirty out of a total of thirty-nine owners of property fronting both sides of Labadie Avenue between Taylor Avenue and Cora Avenue in the city of St. Louis, signed an agreement, which was subsequently recorded, providing in part:

> ". . . the said property is hereby restricted to the use and occupancy for the term of Fifty (50) years from this date, so that it shall be a condition all the time and whether recited and referred to as [sic] not in subsequent conveyances and shall attach to the land as a condition precedent to the sale of the same, that hereafter no part of said property or any

portion thereof shall be, for said term of Fifty-years, occupied by any person not of the Caucasian race, it being intended hereby to restrict the use of said property for said period of time against the occupancy as owners or tenants of any portion of said property for resident or other purpose by people of the Negro or Mongolian Race."

The entire district described in the agreement included fifty-seven parcels of land. The thirty owners who signed the agreement held title to forty-seven parcels, including the particular parcel involved in this case. At the time the agreement was signed, five of the parcels in the district were owned by Negroes. One of those had been occupied by Negro families since 1882, nearly thirty years before the restrictive agreement was executed. The trial court found that owners of seven out of nine homes on the south side of Labadie Avenue, within the restricted district and "in the immediate vicinity" of the premises in question, had failed to sign the restrictive agreement in 1911. At the time this action was brought, four of the premises were occupied by Negroes, and had been so occupied for periods ranging from twenty-three to sixty-three years. A fifth parcel had been occupied by Negroes until a year before this suit was instituted.

On August 11, 1945, pursuant to a contract of sale, petitioners Shelley, who are Negroes, for valuable consideration received from one Fitzgerald a warranty deed to the parcel in question.[1] The trial court found that petitioners had no actual knowledge of the restrictive agreement at the time of the purchase.

---

[1] The trial court found that title to the property which petitioners Shelley sought to purchase was held by one Bishop, a real estate dealer, who placed the property in the name of Josephine Fitzgerald. Bishop, who acted as agent for petitioners in the purchase, concealed the fact of his ownership.

On October 9, 1945, respondents, as owners of other property subject to the terms of the restrictive covenant, brought suit in the Circuit Court of the city of St. Louis praying that petitioners Shelley be restrained from taking possession of the property and that judgment be entered divesting title out of petitioners Shelley and revesting title in the immediate grantor or in such other person as the court should direct. The trial court denied the requested relief on the ground that the restrictive agreement, upon which respondents based their action, had never become final and complete because it was the intention of the parties to that agreement that it was not to become effective until signed by all property owners in the district, and signatures of all the owners had never been obtained.

The Supreme Court of Missouri sitting *en banc* reversed and directed the trial court to grant the relief for which respondents had prayed. That court held the agreement effective and concluded that enforcement of its provisions violated no rights guaranteed to petitioners by the Federal Constitution.[2] At the time the court rendered its decision, petitioners were occupying the property in question.

The second of the cases under consideration comes to this Court from the Supreme Court of Michigan. The circumstances presented do not differ materially from the Missouri case. In June, 1934, one Ferguson and his wife, who then owned the property located in the city of Detroit which is involved in this case, executed a contract providing in part:

> "This property shall not be used or occupied by any person or persons except those of the Caucasian race.

---

[2] *Kraemer* v. *Shelley*, 355 Mo. 814, 198 S. W. 2d 679 (1946).

"It is further agreed that this restriction shall not be effective unless at least eighty percent of the property fronting on both sides of the street in the block where our land is located is subjected to this or a similar restriction."

The agreement provided that the restrictions were to remain in effect until January 1, 1960. The contract was subsequently recorded; and similar agreements were executed with respect to eighty percent of the lots in the block in which the property in question is situated.

By deed dated November 30, 1944, petitioners, who were found by the trial court to be Negroes, acquired title to the property and thereupon entered into its occupancy. On January 30, 1945, respondents, as owners of property subject to the terms of the restrictive agreement, brought suit against petitioners in the Circuit Court of Wayne County. After a hearing, the court entered a decree directing petitioners to move from the property within ninety days. Petitioners were further enjoined and restrained from using or occupying the premises in the future. On appeal, the Supreme Court of Michigan affirmed, deciding adversely to petitioners' contentions that they had been denied rights protected by the Fourteenth Amendment.[3]

Petitioners have placed primary reliance on their contentions, first raised in the state courts, that judicial enforcement of the restrictive agreements in these cases has violated rights guaranteed to petitioners by the Fourteenth Amendment of the Federal Constitution and Acts of Congress passed pursuant to that Amendment.[4] Spe-

---

[3] *Sipes* v. *McGhee,* 316 Mich. 614, 25 N. W. 2d 638 (1947).

[4] The first section of the Fourteenth Amendment provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the

8

cifically, petitioners urge that they have been denied the equal protection of the laws, deprived of property without due process of law, and have been denied privileges and immunities of citizens of the United States. We pass to a consideration of those issues.

## I.

Whether the equal protection clause of the Fourteenth Amendment inhibits judicial enforcement by state courts of restrictive covenants based on race or color is a question which this Court has not heretofore been called upon to consider. Only two cases have been decided by this Court which in any way have involved the enforcement of such agreements. The first of these was the case of *Corrigan* v. *Buckley*, 271 U. S. 323 (1926). There, suit was brought in the courts of the District of Columbia to enjoin a threatened violation of certain restrictive covenants relating to lands situated in the city of Washington. Relief was granted, and the case was brought here on appeal. It is apparent that that case, which had originated in the federal courts and involved the enforcement of covenants on land located in the District of Columbia, could present no issues under the Fourteenth Amendment; for that Amendment by its terms applies only to the States. Nor was the question of the validity of court enforcement of the restrictive covenants under the Fifth Amendment properly before the Court, as the opinion of this Court specifically recognizes.[5] The only constitutional issue which the appellants had raised in the lower courts, and hence the only constitutional issue

State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[5] *Corrigan* v. *Buckley*, 271 U. S. 323, 330–331 (1926).

before this Court on appeal, was the validity of the covenant agreements as such. This Court concluded that since the inhibitions of the constitutional provisions invoked apply only to governmental action, as contrasted to action of private individuals, there was no showing that the covenants, which were simply agreements between private property owners, were invalid. Accordingly, the appeal was dismissed for want of a substantial question. Nothing in the opinion of this Court, therefore, may properly be regarded as an adjudication on the merits of the constitutional issues presented by these cases, which raise the question of the validity, not of the private agreements as such, but of the judicial enforcement of those agreements.

The second of the cases involving racial restrictive covenants was *Hansberry* v. *Lee,* 311 U. S. 32 (1940). In that case, petitioners, white property owners, were enjoined by the state courts from violating the terms of a restrictive agreement. The state Supreme Court had held petitioners bound by an earlier judicial determination, in litigation in which petitioners were not parties, upholding the validity of the restrictive agreement, although, in fact, the agreement had not been signed by the number of owners necessary to make it effective under state law. This Court reversed the judgment of the state Supreme Court upon the ground that petitioners had been denied due process of law in being held estopped to challenge the validity of the agreement on the theory, accepted by the state court, that the earlier litigation, in which petitioners did not participate, was in the nature of a class suit. In arriving at its result, this Court did not reach the issues presented by the cases now under consideration.

It is well, at the outset, to scrutinize the terms of the restrictive agreements involved in these cases. In the Missouri case, the covenant declares that no part of the

affected property shall be "occupied by any person not of the Caucasian race, it being intended hereby to restrict the use of said property . . . against the occupancy as owners or tenants of any portion of said property for resident or other purpose by people of the Negro or Mongolian Race." Not only does the restriction seek to proscribe use and occupancy of the affected properties by members of the excluded class, but as construed by the Missouri courts, the agreement requires that title of any person who uses his property in violation of the restriction shall be divested. The restriction of the covenant in the Michigan case seeks to bar occupancy by persons of the excluded class. It provides that "This property shall not be used or occupied by any person or persons except those of the Caucasian race."

It should be observed that these covenants do not seek to proscribe any particular use of the affected properties. Use of the properties for residential occupancy, as such, is not forbidden. The restrictions of these agreements, rather, are directed toward a designated class of persons and seek to determine who may and who may not own or make use of the properties for residential purposes. The excluded class is defined wholly in terms of race or color; "simply that and nothing more." [6]

It cannot be doubted that among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment are the rights to acquire, enjoy, own and dispose of property. Equality in the enjoyment of property rights was regarded by the framers of that Amendment as an essential pre-condition to the realization of other basic civil rights and liberties which the Amendment was intended to guarantee.[7] Thus,

---

[6] *Buchanan* v. *Warley*, 245 U. S. 60, 73 (1917).

[7] *Slaughter-House Cases*, 16 Wall. 36, 70, 81 (1873). See Flack, The Adoption of the Fourteenth Amendment.

§ 1978 of the Revised Statutes, derived from § 1 of the Civil Rights Act of 1866 which was enacted by Congress while the Fourteenth Amendment was also under consideration,[8] provides:

> "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." [9]

This Court has given specific recognition to the same principle. *Buchanan* v. *Warley,* 245 U. S. 60 (1917).

It is likewise clear that restrictions on the right of occupancy of the sort sought to be created by the private agreements in these cases could not be squared with the requirements of the Fourteenth Amendment if imposed by state statute or local ordinance. We do not understand respondents to urge the contrary. In the case of *Buchanan* v. *Warley, supra,* a unanimous Court declared unconstitutional the provisions of a city ordinance which denied to colored persons the right to occupy houses in blocks in which the greater number of houses were occupied by white persons, and imposed similar restrictions on white persons with respect to blocks in which the greater number of houses were occupied by colored persons. During the course of the opinion in that case, this Court stated: "The Fourteenth Amendment and these statutes enacted in furtherance of its purpose operate to qualify and entitle a colored man to acquire

---

[8] In *Oyama* v. *California,* 332 U. S. 633, 640 (1948) the section of the Civil Rights Act herein considered is described as the federal statute, "enacted before the Fourteenth Amendment but vindicated by it." The Civil Rights Act of 1866 was reenacted in § 18 of the Act of May 31, 1870, subsequent to the adoption of the Fourteenth Amendment. 16 Stat. 144.

[9] 14 Stat. 27, 8 U. S. C. § 42.

12

property without state legislation discriminating against him solely because of color." [10]

In *Harmon* v. *Tyler,* 273 U. S. 668 (1927), a unanimous court, on the authority of *Buchanan* v. *Warley, supra,* declared invalid an ordinance which forbade any Negro to establish a home on any property in a white community or any white person to establish a home in a Negro community, "except on the written consent of a majority of the persons of the opposite race inhabiting such community or portion of the City to be affected."

The precise question before this Court in both the *Buchanan* and *Harmon* cases involved the rights of white sellers to dispose of their properties free from restrictions as to potential purchasers based on considerations of race or color. But that such legislation is also offensive to the rights of those desiring to acquire and occupy property and barred on grounds of race or color is clear, not only from the language of the opinion in *Buchanan* v. *Warley, supra,* but from this Court's disposition of the case of *Richmond* v. *Deans,* 281 U. S. 704 (1930). There, a Negro, barred from the occupancy of certain property by the terms of an ordinance similar to that in the *Buchanan* case, sought injunctive relief in the federal courts to enjoin the enforcement of the ordinance on the grounds that its provisions violated the terms of the Fourteenth Amendment. Such relief was granted, and this Court affirmed, finding the citation of *Buchanan* v. *Warley, supra,* and *Harmon* v. *Tyler, supra,* sufficient to support its judgment. [11]

But the present cases, unlike those just discussed, do not involve action by state legislatures or city councils.

___

[10] *Buchanan* v. *Warley,* 245 U. S. 60, 79 (1917).

[11] Courts of Georgia, Maryland, North Carolina, Oklahoma, Texas, and Virginia have also declared similar statutes invalid as being in contravention of the Fourteenth Amendment. *Glover* v. *Atlanta,*

Here the particular patterns of discrimination and the areas in which the restrictions are to operate, are determined, in the first instance, by the terms of agreements among private individuals. Participation of the State consists in the enforcement of the restrictions so defined. The crucial issue with which we are here confronted is whether this distinction removes these cases from the operation of the prohibitory provisions of the Fourteenth Amendment.

Since the decision of this Court in the *Civil Rights Cases,* 109 U. S. 3 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.[12]

We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated. Cf. *Corrigan* v. *Buckley, supra.*

But here there was more. These are cases in which the purposes of the agreements were secured only by judicial enforcement by state courts of the restrictive

---

148 Ga. 285, 96 S. E. 562 (1918); *Jackson* v. *State,* 132 Md. 311, 103 A. 910 (1918); *Clinard* v. *Winston-Salem,* 217 N. C. 119, 6 S. E. 2d 867 (1940); *Allen* v. *Oklahoma City,* 175 Okla. 421, 52 P. 2d 1054 (1936); *Liberty Annex Corp.* v. *Dallas,* 289 S. W. 1067 (Tex. Civ. App. 1927); *Irvine* v. *Clifton Forge,* 124 Va. 781, 97 S. E. 310 (1918).

[12] And see *United States* v. *Harris,* 106 U. S. 629 (1883); *United States* v. *Cruikshank,* 92 U. S. 542 (1876).

14

terms of the agreements. The respondents urge that
judicial enforcement of private agreements does not
amount to state action; or, in any event, the participation
of the State is so attenuated in character as not to amount
to state action within the meaning of the Fourteenth
Amendment. Finally, it is suggested, even if the States
in these cases may be deemed to have acted in the consti-
tutional sense, their action did not deprive petitioners
of rights guaranteed by the Fourteenth Amendment. We
move to a consideration of these matters.

## II.

That the action of state courts and judicial officers
in their official capacities is to be regarded as action of
the State within the meaning of the Fourteenth Amend-
ment, is a proposition which has long been established
by decisions of this Court. That principle was given ex-
pression in the earliest cases involving the construction
of the terms of the Fourteenth Amendment. Thus, in
*Virginia* v. *Rives,* 100 U. S. 313, 318 (1880), this Court
stated: "It is doubtless true that a State may act through
different agencies,—either by its legislative, its executive,
or its judicial authorities; and the prohibitions of the
amendment extend to all action of the State denying
equal protection of the laws, whether it be action by one
of these agencies or by another." In *Ex parte Virginia,*
100 U. S. 339, 347 (1880), the Court observed: "A
State acts by its legislative, its executive, or its judicial
authorities. It can act in no other way." In the *Civil
Rights Cases,* 109 U. S. 3, 11, 17 (1883), this Court pointed
out that the Amendment makes void "State action of
every kind" which is inconsistent with the guaranties
therein contained, and extends to manifestations of "State
authority in the shape of laws, customs, or judicial or
executive proceedings." Language to like effect is em-

ployed no less than eighteen times during the course of that opinion.[13]

Similar expressions, giving specific recognition to the fact that judicial action is to be regarded as action of the State for the purposes of the Fourteenth Amendment, are to be found in numerous cases which have been more recently decided. In *Twining* v. *New Jersey,* 211 U. S. 78, 90–91 (1908), the Court said: "The judicial act of the highest court of the State, in authoritatively construing and enforcing its laws, is the act of the State." In *Brinkerhoff-Faris Trust & Savings Co.* v. *Hill,* 281 U. S. 673, 680 (1930), the Court, through Mr. Justice Brandeis, stated: "The federal guaranty of due process extends to state action through its judicial as well as through its legislative, executive or administrative branch of government." Further examples of such declarations in the opinions of this Court are not lacking.[14]

One of the earliest applications of the prohibitions contained in the Fourteenth Amendment to action of state

---

[13] Among the phrases appearing in the opinion are the following: "the operation of State laws, and the action of State officers executive or judicial"; "State laws and State proceedings"; "State law . . . or some State action through its officers or agents"; "State laws and acts done under State authority"; "State laws, or State action of some kind"; "such laws as the States may adopt or enforce"; "such acts and proceedings as the States may commit or take"; "State legislation or action"; "State law or State authority."

[14] *Neal* v. *Delaware,* 103 U. S. 370, 397 (1881); *Scott* v. *McNeal,* 154 U. S. 34, 45 (1894); *Chicago, Burlington and Quincy R. Co.* v. *Chicago,* 166 U. S. 226, 233–235 (1897); *Hovey* v. *Elliott,* 167 U. S. 409, 417–418 (1897); *Carter* v. *Texas,* 177 U. S. 442, 447 (1900); *Martin* v. *Texas,* 200 U. S. 316, 319 (1906); *Raymond* v. *Chicago Union Traction Co.,* 207 U. S. 20, 35–36 (1907); *Home Telephone and Telegraph Co.* v. *Los Angeles,* 227 U. S. 278, 286–287 (1913); *Prudential Insurance Co.* v. *Cheek,* 259 U. S. 530, 548 (1922); *American Railway Express Co.* v. *Kentucky,* 273 U. S. 269, 274 (1927); *Mooney* v. *Holohan,* 294 U. S. 103, 112–113 (1935); *Hansberry* v. *Lee,* 311 U. S. 32, 41 (1940).

judicial officials occurred in cases in which Negroes had been excluded from jury service in criminal prosecutions by reason of their race or color. These cases demonstrate, also, the early recognition by this Court that state action in violation of the Amendment's provisions is equally repugnant to the constitutional commands whether directed by state statute or taken by a judicial official in the absence of statute. Thus, in *Strauder* v. *West Virginia*, 100 U. S. 303 (1880), this Court declared invalid a state statute restricting jury service to white persons as amounting to a denial of the equal protection of the laws to the colored defendant in that case. In the same volume of the reports, the Court in *Ex parte Virginia*, *supra*, held that a similar discrimination imposed by the action of a state judge denied rights protected by the Amendment, despite the fact that the language of the state statute relating to jury service contained no such restrictions.

The action of state courts in imposing penalties or depriving parties of other substantive rights without providing adequate notice and opportunity to defend, has, of course, long been regarded as a denial of the due process of law guaranteed by the Fourteenth Amendment. *Brinkerhoff-Faris Trust & Savings Co.* v. *Hill, supra.* Cf. *Pennoyer* v. *Neff*, 95 U. S. 714 (1878).[15]

In numerous cases, this Court has reversed criminal convictions in state courts for failure of those courts to provide the essential ingredients of a fair hearing. Thus it has been held that convictions obtained in state courts under the domination of a mob are void. *Moore* v. *Dempsey*, 261 U. S. 86 (1923). And see *Frank* v. *Mangum*, 237 U. S. 309 (1915). Convictions obtained by

---

[15] And see *Standard Oil Co.* v. *Missouri*, 224 U. S. 270, 281–282 (1912); *Hansberry* v. *Lee*, 311 U. S. 32 (1940).

coerced confessions,[16] by the use of perjured testimony known by the prosecution to be such,[17] or without the effective assistance of counsel,[18] have also been held to be exertions of state authority in conflict with the fundamental rights protected by the Fourteenth Amendment.

But the examples of state judicial action which have been held by this Court to violate the Amendment's commands are not restricted to situations in which the judicial proceedings were found in some manner to be procedurally unfair. It has been recognized that the action of state courts in enforcing a substantive common-law rule formulated by those courts, may result in the denial of rights guaranteed by the Fourteenth Amendment, even though the judicial proceedings in such cases may have been in complete accord with the most rigorous conceptions of procedural due process.[19] Thus, in *American Federation of Labor* v. *Swing,* 312 U. S. 321 (1941), enforcement by state courts of the common-law policy of the State, which resulted in the restraining of peaceful picketing, was held to be state action of the sort prohibited by the Amendment's guaranties of freedom of discussion.[20] In *Cantwell* v. *Connecticut,* 310 U. S. 296

---

[16] *Brown* v. *Mississippi,* 297 U. S. 278 (1936); *Chambers* v. *Florida,* 309 U. S. 227 (1940); *Ashcraft* v. *Tennessee,* 322 U. S. 143 (1944); *Lee* v. *Mississippi,* 332 U. S. 742 (1948).

[17] See *Mooney* v. *Holohan,* 294 U. S. 103 (1935); *Pyle* v. *Kansas,* 317 U. S. 213 (1942).

[18] *Powell* v. *Alabama,* 287 U. S. 45 (1932); *Williams* v. *Kaiser,* 323 U. S. 471 (1945); *Tomkins* v. *Missouri,* 323 U. S. 485 (1945); *De Meerleer* v. *Michigan,* 329 U. S. 663 (1947).

[19] In applying the rule of *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), it is clear that the common-law rules enunciated by state courts in judicial opinions are to be regarded as a part of the law of the State.

[20] And see *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769 (1942); *Cafeteria Employees Union* v. *Angelos,* 320 U. S. 293 (1943).

(1940), a conviction in a state court of the common-law crime of breach of the peace was, under the circumstances of the case, found to be a violation of the Amendment's commands relating to freedom of religion. In *Bridges* v. *California,* 314 U. S. 252 (1941), enforcement of the state's common-law rule relating to contempts by publication was held to be state action inconsistent with the prohibitions of the Fourteenth Amendment.[21] And cf. *Chicago, Burlington and Quincy R. Co.* v. *Chicago,* 166 U. S. 226 (1897).

The short of the matter is that from the time of the adoption of the Fourteenth Amendment until the present, it has been the consistent ruling of this Court that the action of the States to which the Amendment has reference includes action of state courts and state judicial officials. Although, in construing the terms of the Fourteenth Amendment, differences have from time to time been expressed as to whether particular types of state action may be said to offend the Amendment's prohibitory provisions, it has never been suggested that state court action is immunized from the operation of those provisions simply because the act is that of the judicial branch of the state government.

### III.

Against this background of judicial construction, extending over a period of some three-quarters of a century, we are called upon to consider whether enforcement by state courts of the restrictive agreements in these cases may be deemed to be the acts of those States; and, if so, whether that action has denied these petitioners the equal protection of the laws which the Amendment was intended to insure.

---

[21] And see *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *Craig* v. *Harney,* 331 U. S. 367 (1947).

We have no doubt that there has been state action in these cases in the full and complete sense of the phrase. The undisputed facts disclose that petitioners were willing purchasers of properties upon which they desired to establish homes. The owners of the properties were willing sellers; and contracts of sale were accordingly consummated. It is clear that but for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint.

These are not cases, as has been suggested, in which the States have merely abstained from action, leaving private individuals free to impose such discriminations as they see fit. Rather, these are cases in which the States have made available to such individuals the full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell. The difference between judicial enforcement and non-enforcement of the restrictive covenants is the difference to petitioners between being denied rights of property available to other members of the community and being accorded full enjoyment of those rights on an equal footing.

The enforcement of the restrictive agreements by the state courts in these cases was directed pursuant to the common-law policy of the States as formulated by those courts in earlier decisions.[22] In the Missouri case, enforcement of the covenant was directed in the first instance by the highest court of the State after the trial court had determined the agreement to be invalid for

[22] See *Swain* v. *Maxwell,* 355 Mo. 448, 196 S. W. 2d 780 (1946); *Koehler* v. *Rowland,* 275 Mo. 573, 205 S. W. 217 (1918). See also *Parmalee* v. *Morris,* 218 Mich. 625, 188 N. W. 330 (1922). Cf. *Porter* v. *Barrett,* 233 Mich. 373, 206 N. W. 532 (1925).

want of the requisite number of signatures. In the Michigan case, the order of enforcement by the trial court was affirmed by the highest state court.[23] The judicial action in each case bears the clear and unmistakable imprimatur of the State. We have noted that previous decisions of this Court have established the proposition that judicial action is not immunized from the operation of the Fourteenth Amendment simply because it is taken pursuant to the state's common-law policy.[24] Nor is the Amendment ineffective simply because the particular pattern of discrimination, which the State has enforced, was defined initially by the terms of a private agreement. State action, as that phrase is understood for the purposes of the Fourteenth Amendment, refers to exertions of state power in all forms. And when the effect of that action is to deny rights subject to the protection of the Fourteenth Amendment, it is the obligation of this Court to enforce the constitutional commands.

We hold that in granting judicial enforcement of the restrictive agreements in these cases, the States have denied petitioners the equal protection of the laws and that, therefore, the action of the state courts cannot stand. We have noted that freedom from discrimination by the States in the enjoyment of property rights was among the basic objectives sought to be effectuated by the framers of the Fourteenth Amendment. That such discrimination has occurred in these cases is clear. Because of the race or color of these petitioners they have been denied rights of ownership or occupancy enjoyed as a matter of course by other citizens of different race or

[23] Cf. *Home Telephone and Telegraph Co.* v. *Los Angeles,* 227 U. S. 278 (1913); *Raymond* v. *Chicago Union Traction Co.,* 207 U. S. 20 (1907).

[24] *Bridges* v. *California,* 314 U. S. 252 (1941); *American Federation of Labor* v. *Swing,* 312 U. S. 321 (1941).

color.[25]    The Fourteenth Amendment declares "that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color."[26]    *Strauder* v. *West Virginia, supra* at 307.    Only recently this Court had occasion to declare that a state law which denied equal enjoyment of property rights to a designated class of citizens of specified race and ancestry, was not a legitimate exercise of the state's police power but violated the guaranty of the equal protection of the laws.    *Oyama* v. *California,* 332 U. S. 633 (1948).    Nor may the discriminations imposed by the state courts in these cases be justified as proper exertions of state police power.[27]    Cf. *Buchanan* v. *Warley, supra.*

Respondents urge, however, that since the state courts stand ready to enforce restrictive covenants excluding white persons from the ownership or occupancy of property covered by such agreements, enforcement of covenants excluding colored persons may not be deemed a denial of equal protection of the laws to the colored persons who are thereby affected.[28]    This contention does

---

[25] See *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886); *Strauder* v. *West Virginia,* 100 U. S. 303 (1880); *Truax* v. *Raich,* 239 U. S. 33 (1915).

[26] Restrictive agreements of the sort involved in these cases have been used to exclude other than Negroes from the ownership or occupancy of real property.    We are informed that such agreements have been directed against Indians, Jews, Chinese, Japanese, Mexicans, Hawaiians, Puerto Ricans, and Filipinos, among others.

[27] See *Bridges* v. *California,* 314 U. S. 252, 261 (1941); *Cantwell* v. *Connecticut,* 310 U. S. 296, 307–308 (1940).

[28] It should be observed that the restrictions relating to residential occupancy contained in ordinances involved in the *Buchanan, Harmon* and *Deans* cases, cited *supra,* and declared by this Court to be inconsistent with the requirements of the Fourteenth Amendment, applied equally to white persons and Negroes.

not bear scrutiny. The parties have directed our attention to no case in which a court, state or federal, has been called upon to enforce a covenant excluding members of the white majority from ownership or occupancy of real property on grounds of race or color. But there are more fundamental considerations. The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights.[29] It is, therefore, no answer to these petitioners to say that the courts may also be induced to deny white persons rights of ownership and occupancy on grounds of race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.

Nor do we find merit in the suggestion that property owners who are parties to these agreements are denied equal protection of the laws if denied access to the courts to enforce the terms of restrictive covenants and to assert property rights which the state courts have held to be created by such agreements. The Constitution confers upon no individual the right to demand action by the State which results in the denial of equal protection of the laws to other individuals. And it would appear beyond question that the power of the State to create and enforce property interests must be exercised within the boundaries defined by the Fourteenth Amendment. Cf. *Marsh* v. *Alabama*, 326 U S. 501 (1946).

The problem of defining the scope of the restrictions which the Federal Constitution imposes upon exertions of power by the States has given rise to many of the most persistent and fundamental issues which this Court has been called upon to consider. That problem was foremost in the minds of the framers of the Constitution,

---

[29] *McCabe* v. *Atchison, Topeka & Santa Fe R. Co.*, 235 U. S. 151, 161–162 (1914); *Missouri ex rel. Gaines* v. *Canada*, 305 U. S. 337 (1938); *Oyama* v. *California*, 332 U. S. 633 (1948).

and, since that early day, has arisen in a multitude of forms. The task of determining whether the action of a State offends constitutional provisions is one which may not be undertaken lightly. Where, however, it is clear that the action of the State violates the terms of the fundamental charter, it is the obligation of this Court so to declare.

The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten. Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color. Seventy-five years ago this Court announced that the provisions of the Amendment are to be construed with this fundamental purpose in mind.[30] Upon full consideration, we have concluded that in these cases the States have acted to deny petitioners the equal protection of the laws guaranteed by the Fourteenth Amendment. Having so decided, we find it unnecessary to consider whether petitioners have also been deprived of property without due process of law or denied privileges and immunities of citizens of the United States.

For the reasons stated, the judgment of the Supreme Court of Missouri and the judgment of the Supreme Court of Michigan must be reversed.

*Reversed.*

MR. JUSTICE REED, MR. JUSTICE JACKSON, and MR. JUSTICE RUTLEDGE took no part in the consideration or decision of these cases.

---

[30] *Slaughter-House Cases,* 16 Wall. 36, 81 (1873); *Strauder* v. *West Virginia,* 100 U. S. 303 (1880). See Flack, The Adoption of the Fourteenth Amendment.