798 P.2d 387

Robert F. FEDEROFF and Katherine Federoff, husband and wife; Chris Davis, a single woman; Karen Knieriem; Sandra Sylvester; Lorne Graham Wilson and Barbara B. Wilson, husband and wife; Robert Miller; and Marcia Lincoln, Plaintiffs/Appellants/Cross–Appellees,

v.

PIONEER TITLE & TRUST COMPANY OF ARIZONA, an Arizona corporation, as Trustee under Trust No. 11612; H & R Associates, a limited partnership; Lowell E. Rothschild and Ann S. Rothschild, husband and wife; George T. Schultz and Linda K. Schultz, husband and wife; Wayne Terpstra and Tamara Terpstra, husband and wife; Larry Duane Casoni and Maryann Casoni, husband and wife; Joseph A. Buono and Angela T. Buono, husband and wife; Sergio Martinez and Irma Y. Martinez, husband and wife; Kerry R. Cox and Patricia Cox, husband and wife; Darryl D. Koeppel and Sandra J. Koeppel, husband and wife; Robert J. Casuli and Sandra J. Casuli, husband and wife; Glenn Griffith and Carol Griffith, husband and wife; Stanley Murray and Kathleen Murray, husband and wife; Gregory J. Bennett and Christine A. Bennett, husband and wife; Phillip M. Ramirez and Susan M. Ra-

mirez, husband and wife; Tim Gordon and Jeanette Gordon, husband and wife; Ronald Ying Yee and Karen R. Lee Yee, husband and wife; William C. Stellbrink and Retha Barbara Stellbrink, husband and wife; Ernst Stellbrink and Opal Stellbrink, husband and wife; William J. Boxhorn and Linda S. Boxhorn, husband and wife; Marvin Kirk Simmons and Jacquelyn Marie Simmons, husband and wife; William Mooney; John Thomas Glaze and Linda Lee Glaze, husband and wife; Randall B. Terpstra and Pamela K. Terpstra, husband and wife; Dietrich G. Voigt and Florence L. Voigt, husband and wife; Jill S. Brooker; Paul J. Greco and Carol L. Greco, husband and wife; Stephen Dunn and Nancy Dunn, husband and wife; First American Savings and Loan; First American Title; First Gibraltar Mortgage; Pima Savings; Western Savings and Loan, Defendants/Appellees/Cross–Appellants,

and

The Wolfswinkel Group, Inc., an Arizona corporation,
Intervenor/Appellee/Cross–Appellant.

No. 2 CA–CV 89–0085.

Court of Appeals of Arizona,
Division 2, Department B.

March 22, 1990.

Reconsideration Denied May 9, 1990.

Petition for Review Granted in Part and Denied in Part Oct. 9, 1990.*

* Feldman, V.C.J., and Cameron, J., of the Supreme Court, recused themselves and did not participate in the determination of this matter.

Stompoly & Stroud, P.C. by William G. Walker, Tucson, for plaintiffs/appellants/cross-appellees.

Mesch, Clark & Rothschild, P.C. by J. Emery Barker, Tucson, for defendants/appellees/cross-appellants Pioneer Title, H & R Associates & Rothschild.

Jones, Edwards, Smith & Kofron, P.C. by William W. Edwards, Tucson, for defendants/appellees/cross-appellants Schultz, Terpstra, Casoni, Buono, Martinez, Cox, Koeppel, Casuli, Griffith, Murray, Bennett, Ramirez, Gordon, Stellbrink, Boxhorn, Simmons, Mooney, Glaze, Voigt, Brooker, Greco, Dunn, Western Sav. & Loan, First American Savings, First American Title, First Gibraltar and Pima Sav.

Snell & Wilmer by Michael J. Rusing, Tucson, for defendants/appellees/cross-appellants Yee.

Stubbs & Schubart, P.C. by G. Lawrence Schubart, Tucson, for intervenor/appellee/cross-appellant The Wolfswinkel Group, Inc.

FERNANDEZ, Chief Judge.

Appellants seek to reverse the trial court's determination that one of eight restrictive covenants imposed on their land and the lands of the appellees is void and unenforceable. Appellees cross-appeal, contending that the trial court should have ruled that all the restrictions are unenforceable. We agree with appellees and reverse, finding that the covenants are unenforceable.

Appellants are the owners of property located near Ina and Silverbell Roads in Pima County. Appellees H & R Associates and Lowell and Ann Rothschild purchased 40 acres of property near appellants' land that has been developed into a subdivision known as Bridlewood West. Title to the subdivision is held by appellee Pioneer Title & Trust Company pursuant to a deed of trust securing a loan of $480,000. The other individual appellees are owners of lots in the subdivision, and the various savings and loan association and mortgage company appellees hold liens on the lots. Appellee The Wolfswinkel Group, Inc. was granted leave to intervene by the trial court because it owns approximately 670 acres of land affected by the covenants.

In October 1947, two adjoining land-owners executed an agreement that they recorded in the Pima County recorder's office on October 28, 1947. Between them, Charles Logan and Beulah Kingstrand owned 800 acres of land. Logan owned 785 acres, and Kingstrand owned 15. The agreement reads in part as follows:

That we, the undersigned, in consideration of the mutual benefits accruing to us and to each of us, do hereby create, adopt, and place on each of our several parcels of land above mentioned, RESTRICTIONS, CONDITIONS, and RESERVATIONS hereinafter mentioned, all with the intent that such restrictions, conditions, and reservations, and each of them, shall apply to each and all of such parcels, which parcels and each of them, are herein further referred to as the 'property'.

The eight restrictive covenants govern such matters as required setback distances; restrictions on commercial, industrial, and professional buildings; prohibitions against certain types of activities; and a prohibition against selling, leasing or renting to persons not of the Caucasian race.[1]

In July 1950, an amendment to the restrictions agreement was recorded. The amendment was signed by Logan, Kingstrand (who had since become Beulah Killoran), and Rex and Alice McBarnes, who had purchased from Logan a 3.755-acre tract on October 30, 1947 and a 0.742-acre tract on April 16, 1948. The amendment included the following paragraph, the one the trial judge ruled void and unenforceable:

No single family residential building shall be constructed or maintained on any tract of ground having an area of less than three acres, nor shall more than one such residential building be constructed or maintained on any such minimum sized tract.

There is very little difference between the wording of the amended paragraph and its original version. The original agreement also contains the following provisions:

9. The above restrictions, reservations, and conditions shall run with the land and continue and remain in force at all times, and against all persons until August 1, 1951, at which time they shall be automatically extended for a period of five years, and thereafter in successive five year periods unless on or before the end of one of such extension periods the owners of all of the property covered by this agreement shall, by written instrument, duly recorded, declare a termination of the same, except, however, that the restrictions referring to persons not of the white or Caucasian race shall be perpetual.

10. A breach of any of the provisions, conditions, restrictions, and covenants hereby established shall cause the real property upon which such breach occurs to revert to the grantor of the person or persons committing such breach, and the said grantor shall have the right of immediate entry upon such real property in the event of such breach, and as to each tract owner in said property the said provisions, conditions, and covenants shall be a covenant running with the land, and the breach thereof or the continuance of any such breach may be enjoined, abated or remedied by appropriate proceedings by the owner of the reversionary rights or by any such owner of other lots or parcels subject to this agreement but by no other person.

11. A breach of any of the foregoing restrictions, conditions, reservations, provisions, and covenants, however, or any re-entry by reason of such breach, shall not defeat or render invalid the lien of any Mortgage or Deed of Trust made in good faith for value as to any tract or portion of said property, but the same restrictions, conditions, reservations, provisions and covenants shall be binding upon and effective against all persons owning or claiming to own any of said tracts or portions of said property whose title thereto, or the title of whose grantor thereto, is or was acquired by fore-

---

1. That covenant, of course, is not enforceable in any event. *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

closure, judicial sale, Trustees' sale, or otherwise.

H & R Associates and the Rothschilds purchased their property sometime between 1978 and 1980. In 1980, they applied to have their property rezoned from SR, a category that permits only one residence for each 3.3 acres, to CR–1, a category that permits one residence per acre. The rezoning was approved in the fall of 1980. In March 1985, the developer began blading roads and conducting soil percolating tests to meet requirements for subdivision approval of the Arizona Department of Real Estate. That approval was given in October 1985. There are 31 lots in the subdivision.

Appellants filed suit October 8, 1986, seeking an injunction prohibiting violation of the restrictive covenants. A preliminary injunction enjoining H & R from selling or developing any lot less than three acres in size was issued in November 1986 after a hearing. The case was tried to the court in May 1987.

Hector Abril, the general partner of H & R Associates, testified that Ticor Title Insurance Company prepared the application for the subdivision approval. The subdivision report indicates that there are covenants of record by reciting the book and page number in the recorder's office where they are found. The covenants are not otherwise discussed. Abril testified that he never discussed the covenants with Ticor. He testified that he was unaware of the specific provisions of the covenants until suit was filed. Lowell Rothschild testified that he did not remember seeing the preliminary title report that apparently mentioned the covenants before he joined in the purchase of the property. He also testified that he was unaware of the specific provisions until suit was filed. Appellants offered into evidence answers to interrogatories of The Wolfswinkel Group. Those answers stated that its 673 acres were purchased in four separate parcels. The answers also stated that the covenants were *reflected in the* preliminary title report for three of the purchases. The single exception was for the purchase of a 40–acre parcel.

By the time of trial, H & R had sold 26 of the 31 lots. Of the 18 lot owners who testified at trial, six had built a home on their property by the time they were served in the suit. All but two of the 16 lot owners who were asked testified that they had read the subdivision report before they purchased the property. One testified that he had not received a copy of the report, and one testified that he did not remember having seen it before.

In December 1987, the court ruled that "enforcement of the covenants would effectively deny economically viable use of defendants' land. The imposition of numerous governmental regulations on land use since the date of the covenants is a change in conditions which makes use of defendants' property uneconomical if the covenants are enforced." The preliminary injunction was dissolved in December 1987, and the judgment entered in June 1988 declared only paragraph 4 of the restrictions to be void and unenforceable. That covenant requires a minimum lot size of three acres.

Appellants complain on appeal that the trial court erred in invalidating paragraph 4 of the covenants, arguing that additional governmental requirements do not constitute a change in circumstances, that covenants cannot be invalidated simply to increase the value of land, that appellees failed to show a change of circumstances, and that appellees cannot be granted relief because they intentionally breached the covenants. Appellees contend in their cross-appeal that the court should have found all the restrictions unenforceable, arguing that appellants failed to show the existence of a general scheme or plan; that the rights created were personal to the promisors; that appellants have no right to enforce the covenants because they are not assignees of the beneficial interest, are not third-party beneficiaries, and are distant grantees; that the covenants violate the rule against perpetuities; and that their excessive duration is sufficient reason to invalidate them. Appellees also complain

because the trial court denied them recovery of damages sustained while the preliminary injunction was in effect and refused to award them attorney's fees.

## CHANGE IN CIRCUMSTANCES

■ "[E]quity will enforce the terms of restrictive covenants unless the changes in the surrounding areas are so fundamental or radical as to defeat or frustrate the original purposes of the restrictions." *Decker v. Hendricks*, 97 Ariz. 36, 41, 396 P.2d 609, 612 (1964). In determining whether a change in conditions has occurred, the court must consider changes that have occurred within the property area covered by the restrictions; changes outside the area cannot be considered. *Decker v. Hendricks*, 7 Ariz.App. 162, 436 P.2d 940 (1968).

Appellees presented the testimony of two land planners and a real estate broker who testified that if the Wolfswinkel property were required to be developed according to the restrictive covenants, it would cost approximately $30,000 per lot. The broker testified that if one added to that figure the cost of the land, the cost of financing a subdivision, a 20% profit, and a broker's commission, a developer would have to sell lots at a price of $144,000. He testified that lots in that area cannot be sold at that price. One of the land planners testified that in 1947 when the covenants were recorded, Pima County had no zoning ordinance. He testified that a person developing the land would now have to comply not only with the county zoning ordinance but also with hillside development requirements; county subdivision requirements; county landscaping, buffering and screening standards; county off-street parking-loading requirements; roadway standards; the flood control district-flood plain ordinance; the Tucson Mountain Area plan; and the state real estate department subdivision requirements.

■ The essence of appellees' testimony was that increased governmental regulation since the date the covenants were adopted has rendered it impossible for them to profitably develop their land.

There was no testimony that the property itself has substantially changed since 1947. It has been held that a change in zoning is insufficient to support a claim of changed circumstances so as to invalidate a restrictive covenant. *Decker v. Hendricks*, 97 Ariz. 36, 396 P.2d 609 (1964); *Murphey v. Gray*, 84 Ariz. 299, 327 P.2d 751 (1958); *Goodman v. Superior Court*, 137 Ariz. 348, 670 P.2d 746 (App.1983); *see also Rofe v. Robinson*, 415 Mich. 345, 329 N.W.2d 704 (1982). Appellees have cited us no case in which a court has invalidated restrictive covenants simply because of changes in governmental regulations.

■ Moreover, "[a] mere change in economic conditions rendering it unprofitable to continue the restrictive use is not alone sufficient to justify abrogating the restrictive covenant." *Shalimar Association v. D.O.C. Enterprises, Ltd.*, 142 Ariz. 36, 45, 688 P.2d 682, 691 (App.1984). In that case, Division One of this court rejected the argument that an implied restrictive covenant that the appellants' property must be used as a golf course was no longer enforceable because the golf course had been historically unprofitable. In *Williams v. Butler*, 76 N.M. 782, 418 P.2d 856 (1966), cited in *Shalimar*, the New Mexico Supreme Court refused to remove restrictive covenants that required the land to be used as a golf course, tennis courts, swimming pool, or for other athletic events, despite a showing that compliance was not economically feasible and that water rights had been lost because of non-use. The court followed the general rule that unprofitability alone is an insufficient basis to rule that covenants are unenforceable.

We thus conclude that the trial court was in error in ruling that paragraph 4 is void and unenforceable because the imposition of governmental regulations since 1947 has made development of appellees' property uneconomical.

## ENFORCEABILITY OF COVENANTS

■ Having determined that the trial court erred in finding that the property has undergone a change in circumstances, we

now address appellees' contentions on cross-appeal that all of the covenants are unenforceable.

An action is not maintainable between purchasers not parties to the original covenant where it does not appear that the covenant was entered into to carry out some general scheme or plan for the improvement or development of the property, or it does not appear that the covenant was entered into for the benefit of the land, or it appears that the covenant was not entered into for the benefit of subsequent purchasers, but only for the benefit of the original covenantee.

*Palermo v. Allen*, 91 Ariz. 57, 64, 369 P.2d 906, 911 (1962). Thus, appellants' first obligation was to establish their right to enforce the covenants.

Rather than producing facts to establish their chain of title, appellants argued that they are permitted to enforce the covenants under the third of the three classes enumerated in *O'Malley v. Central Methodist Church*, 67 Ariz. 245, 194 P.2d 444 (1948).

'In the first class may be placed those which are entered into with the design to carry out a general scheme for the improvement or development of real property. This class embraces all the various plans, generally denominated in the English cases as "building schemes", under which an owner of a large plot or tract of land divides it into building lots, to be sold to different purchasers for separate occupancy, by deeds which contain uniform covenants restricting the use which the several grantees may make of their premises. In such cases the covenant is enforceable by any grantee as against any other, upon the theory that there is a mutuality of covenant and consideration, which binds each and gives to each the appropriate remedy. Such covenants are entered into by the grantees for their mutual protection and benefit, and the consideration therefor lies in the fact that the diminution in the value of the lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract.... The second class embraces those cases in which the grantor exacts a covenant from his grantee, presumptively or actually, for the benefit and protection of contiguous or neighboring lands which the former retains. In such cases the grantees ... cannot enforce the covenant as against each other, although the grantor or his assigns of the property benefited may enforce it against either or all of the grantees of the property burdened with the covenant.... Then there is a third class, where there are mutual covenants between the owners of adjoining lands, in which the restrictions placed upon each produce a corresponding benefit to the other, and in such a case of course, either party or his assigns may invoke equitable aid to restrain a violation of the covenant.'

67 Ariz. at 250–51, 194 P.2d at 448, *quoting Korn v. Campbell*, 192 N.Y. 490, 494–95, 85 N.E. 687, 689 (1908). The difficulty with appellants' argument, however, is that they have not cited to us a single case in which covenants were enforced because they fell within the third class. Because appellants have not shown us the rules that might apply in such cases, then, we must fashion our own rules. We emphasize that the following analysis and determination apply to third class cases only.

Appellants presented very little evidence at trial. Only two of them testified. One was Robert Federoff, who testified that he had lived at his home 15 years and that his property was included in the area covered by the restrictions. He did not testify who sold him his property and did not produce evidence as to his relationship to either Logan, Kingstrand or McBarnes. The second appellant who testified was Sandra Sylvester. She testified only as a rebuttal witness. Sylvester testified that she purchased her home from Randy Stevens in late August 1986, shortly before suit was filed. She too did not establish her chain of title. Appellants did not offer any evidence regarding the intent of the original parties, the surrounding circumstances or their subsequent conduct.

The only evidence as to any deeds was presented by appellees. They introduced a

February 28, 1973 deed in which Beulah Kingstrand Killoran conveyed her entire 15–acre parcel to Betty A. Pettit. There is no mention in the deed of any restrictive covenants. The evidence with regard to Charles Logan was that he died sometime prior to January 15, 1968 and that, pursuant to his will, 13.93 acres of his property was conveyed to Willard and Lua Bever. That acreage is partially inside and partially outside the area covered by the restrictions. The balance of Logan's land was devised to Monmouth College in Monmouth, Illinois. That property also lies partially within and partially without the area covered by the restrictions. There is no mention of any restrictive covenants in the recorded decree that conveyed these properties.

> '[I]f the parties desire to create mutual rights in real property of the character of those claimed here, they must say so, and must say it in the only place where it can be given legal effect, namely, in the written instruments exchanged between them, which constitute the final expression of their understanding.'

*Colonia Verde Homeowners Association v. Kaufman*, 122 Ariz. 574, 577, 596 P.2d 712, 715 (App.1979), *quoting Werner v. Graham*, 181 Cal. 174, 185, 183 P. 945, 949 (1919). Although the court in *Werner* was concerned with a covenant of the first class, its language is instructive and has been relied on more than once in Arizona. *See Palermo v. Allen, supra; Smith v. Second Church of Christ, Scientist*, 87 Ariz. 400, 351 P.2d 1104 (1960); *O'Malley v. Central Methodist Church, supra; R & R Realty Co. v. Weinstein*, 4 Ariz.App. 517, 422 P.2d 148 (1966). In *Werner*, the California Supreme Court concluded that the covenants in question were not enforceable as a general scheme or plan because, although the grantor had recorded a subdivision map and had inserted restrictions in 116 deeds conveying lots to others, he merely quitclaimed plaintiff's lot. The court held that method of conveyance had the effect of releasing the covenants as to that lot. In so holding, the court stated:

> The intent of the common grantor—the original owner—is clear enough. He had

a general plan of restrictions in mind. But it is not his intent that governs. It is the joint intent of himself and his grantees, and as between him and each of his grantees the instrument or instruments between them—in this case, the deed—constitute the final and exclusive memorial of such intent.

181 Cal. at 184, 183 P. at 949.

We believe a California case based on *Werner* is persuasive in view of our fact situation. In *Murry v. Lovell*, 132 Cal. App.2d 30, 281 P.2d 316 (1955), the parties' common grantor had recorded a subdivision map as well as a document establishing restrictions on the property. The grantor testified that when he sold to the parties, he told each of them about the restrictions and read them the recorded document. The court held that the property was not subject to any restrictions because the deeds conveying it contained no mention of the restrictions. Quoting from *Werner*, the court noted:

> 'It is undoubted that, when the owner of a subdivided tract conveys the various parcels in the tract by deeds containing appropriate language imposing restrictions on each parcel as part of a general plan of restrictions common to all the parcels and designed for their mutual benefit, mutual equitable servitudes are thereby created in favor of each parcel as against all the others. * * * In such a case the mutual servitudes spring into existence as between the *first parcel conveyed and the balance of the parcels at the time of the first conveyance.'*

132 Cal.App.2d at 32–33, 281 P.2d at 317, *quoting Werner*, 181 Cal. at 183, 183 P. at 949 (emphasis in *Murry*).

We believe the recorded restrictions here indicate an intent to create restrictive covenants that would run with the land. However, we cannot overlook the fact that the instruments that conveyed the land covered by the restrictions to persons other than Logan and Kingstrand make no mention of the restrictions. Nor can we overlook the fact that although Logan's land was conveyed by his personal representative, it was conveyed according to his will, and the

parcels conveyed to his devisees lie both within and without the area encompassed by the restrictions.

We must rule on the basis of the evidence contained in the record. In light of the scarcity of evidence presented to the trial court, we conclude that appellants failed to establish that the covenants are enforceable and that they have standing to enforce them. We thus hold that the restrictions were personal between Logan and Kingstrand and give no right to distant grantees such as appellants to enforce them against other remote grantees. The restrictions were abandoned once the property was conveyed without them. *See Palermo v. Allen, supra; O'Malley v. Central Methodist Church, supra.*

That same reasoning applies even if, as appellants suggest, we alternatively consider the restrictions to fall under the first class, a common scheme or plan. The cases of both *Palermo* and *O'Malley* involved an attempt to uphold restrictions as a common scheme or plan.

Having determined that the covenants are unenforceable by appellants because they were personal to Logan and Kingstrand, we need not address appellees' other theories as to why they are not enforceable.

Because we hold the restrictions to be unenforceable by appellants as opposed to the trial court's conclusion that only one paragraph was unenforceable because of economic hardship, we remand for the trial court to reconsider the issue of appellees' damages during the 18–month period the preliminary injunction was in effect.

Appellees will be awarded attorney's fees on appeal upon compliance with Rule 21(c), Ariz.R.Civ.App.P., 17B A.R.S.

Reversed and remanded.

LACAGNINA, J., concurs.

LIVERMORE, Presiding Judge, dissenting.

While I agree with the majority that changed economic circumstances do not make *the covenant in issue* unenforceable, I disagree with the conclusion that the failure to incorporate the recorded covenants in the deeds to the initial grantees rendered them "personal" and unenforceable either as a matter of fact or law. If the majority's conclusion is a matter of fact, it violates the rule that the trial judge should make factual determinations in the first instance. That the covenants were stated to run with the land and to continue until terminated by unanimous consent of the subsequent owners coupled with the comprehensive nature of the covenants would surely permit a trier to find that the covenants were not personal. If the conclusion is a matter of law, I think it wrong. Nothing in the *O'Malley* language concerning "mutual covenants between the owners of adjoining lands, in which the restrictions placed upon each produce a corresponding benefit to the other" suggests that any contracting party could deed his lands free of the restrictions to a purchaser taking with notice. Indeed that result is foreclosed by the further language that "either party or his assigns may invoke equitable aid to restrain a violation of the covenant."

The majority seeks to avoid this result by reliance on older California cases. To the extent those cases can be read as implying the right to deed land free of restrictions of record, I believe them misguided. They can also be distinguished. All involve some variation of the common grantor situation. In such cases, the reason for requiring reference to the restrictions in the deeds of the original grantees in order to make them enforceable amongst all subsequent grantees is because, " '[s]o long as a tract remains in one ownership, there can be no dominant and servient tenements as between different portions, and the owner may rearrange the quality of any possible servitude.' " *Gardner v. Maffitt*, 335 Mo. 959, 965, 74 S.W.2d 604, 606–07 (1934), quoting 19 C.J. § 156 at 945 n. 60. In other words, even though a declaration of covenants and restrictions may be recorded, until it is made part and parcel of the mutual obligations which form the basis for the conveyance of a portion of the land, it is merely the unilateral act of the grantor. Once having been made part of a con-

veyance of a portion of the land and therefore binding on the grantor, every subsequent conveyance is subject to the covenants and restrictions, even though not contained in the subsequent deeds.

The situation is markedly different where the recorded covenants result from an agreement between adjoining landowners. Assuming that the agreement is otherwise valid, the covenants are immediately enforceable upon execution as between the parties. Neither party may change or rescind the covenants without the consent of the other. Assuming further that the agreement is recorded and that the covenants were intended by the parties to run with the land, there is no reason to require that they be referred to in any subsequent conveyances in order to be enforceable by the grantees of the original parties to the agreement. While the fact that the covenants in the present case were not incorporated in the initial conveyances is relevant to the question of whether they were intended to be personal rather than running with the land, it is not alone conclusive. The nature of the covenants must be determined by looking to the intent of the parties as evidenced by the language of their agreement and the surrounding circumstances, as well as their subsequent conduct.

I would remand to the trial court for a determination of that issue, along with the defenses raised as to the present enforceability of the covenants, after such further hearings, if any, the court thinks necessary.