422 P.2d 148

R & R REALTY CO., a corporation, Appellant,

v.

Joseph WEINSTEIN and Selma Weinstein, his wife, Inga S. Morton, widow of John B. Morton, deceased, and Wade Childress, Richard Ensign and Herrick Nuzum, Trustees for the Owners of blocks in Williams Addition, in the City of Tucson, Arizona, Appellees.*

No. 2 CA–CIV 63.

Court of Appeals of Arizona.

Dec. 29, 1966.

Rehearing Denied Jan. 27, 1967.

Review Denied Feb. 28, 1967.

518

Fickett & Dunipace, by Fred W. Fickett, Tucson, for appellant.

Spaid, Fish, Briney & Duffield, by William Spaid, Tucson, for appellee Trustees.

John W. Ross, Tucson, for appellee Morton.

John McDonald, Tucson, for appellee Weinstein.

KRUCKER, Chief Judge.

Appellant, plaintiff below, commenced action to quiet title to certain real property denominated Block 5, Williams Addition, an exclusive subdivision located in the city

of Tucson. Appellees, defendants below, are owners of "blocks" in this subdivision and trustees operating water and park facilities in trust for the use and benefit of the property owners in the subdivision. In its complaint appellant alleges that it is the sole owner of Block 5, Williams Addition, that there does not now exist and never did exist any restrictions, conditions or covenants which in any way restrict, control or govern the use or enjoyment of the property, that none of the appellees has any reversionary rights or any right, title or interest of any kind in or to the property and that, therefore, the appellant is not in any way ·restricted in the use and enjoyment of its .property. Cross motions for summary judgment were filed and the trial court granted summary judgment in favor of the appellees and against the appellant. The appellant has appealed from this judgment.

The facts are undisputed and since resolution of this appeal requires close scrutiny of all the facts and surrounding circumstances, they will be fully presented.

On July 13, 1927, Timothy S. Williams and Alice W. Williams, husband and wife, were the owners of a quarter section of land lying east of Tucson and on this date filed and recorded a subdivision plat, titling the same "Williams Addition".[1] The plat divided the land into 25 lots, designated as "Blocks", ranging in size from two and one-half acres to eight acres. Block 5, the subject matter of this action, fronts on Broadway Avenue and consisted of 3.16 acres before certain portions thereof were taken for the widening of Broadway Avenue. The subdivision plat made no reference to any restrictions or covenants and no declaration of covenants, restrictions and/or conditions governing the use of the blocks located in Williams Addition was ever filed by Mr. and Mrs. Williams.

Approximately two years later, on April 19, 1929, Mr. and Mrs. Williams conveyed the first block of Williams Addition to H. Clark Souers and Dorothy F. Souers, to-

gether with a ¹⁄₂₄th interest in the water system and park located in the subdivision. The deed also provided that at such time as the owners of the majority of the blocks in Williams Addition shall request, each block owner would transfer his ¹⁄₂₄th interest in the water system to a trustee to operate in trust for the use and benefit of all property owners. In addition, the deed provided that beginning September 1, 1930, the "owners of the blocks in the Addition aforesaid shall take over the care of said park and roadways and trees in and upon the curbs or streets in said Addition and each block in said addition shall be liable for one-twenty-fourth (¹⁄₂₄) of the cost of caring for said park and trees and the irrigation of the same". Several other provisions were included in this deed as well as thirteen numbered paragraphs containing certain covenants, restrictions and conditions. Specific provisions of this deed will be more closely examined later in this opinion.

After execution and delivery of the Souers' deed, Timothy S. Williams died without having made any further conveyance of property in Williams Addition. His estate was probated and distributed to his widow, Alice W. Williams, who thereafter conveyed Blocks 7, 23, 8, 12 and 20, including an undivided ¹⁄₂₄th interest in the water system and park as above noted, on various dates between April 23 and November 14, 1936. Each of these deeds contained substantially the same language as the Souers' deed including the thirteen numbered paragraphs containing the restrictions, covenants and conditions. The only exception is that the time limit within which the owners of a majority of the blocks in the subdivision could demand a conveyance of the well equipment and water system to a trustee, as contained in the Souers' deed, was omitted in subsequent deeds.

Thereafter, on November 24, 1936, Mrs. Williams died and one of the distributees of her estate filed a partition action seeking a sale of Williams Addition, except those

---

1. The map and plat of Williams Addition has been reproduced as an Appendix to this opinion.

blocks already sold, and distribution of the proceeds among the various heirs. On April 10, 1939, a judgment was entered finding that a fair partition could not be effected without depreciating the value of the property, that a sale would be more beneficial to the interested parties and a commissioner was appointed to conduct the sale. The judgment made no mention of any restrictions or covenants as contained in the prior deeds.

On June 5, 1939, a modified and amended judgment was entered providing substantially the same as the prior judgment. The court ordered the property, including Block 5, sold in one parcel and that the deed should contain certain provisions and restrictions. On July 24, 1939, there was executed and recorded a Commissioner's Deed to the property, which recited:

"Subject, also, to all the restrictions, covenants and agreements, conditions and easements contained in the deeds heretofore given by Timothy S. Williams and Alice W. Williams, his wife, or by Alice W. Williams, as distributee under the decree of distribution of the estate of Timothy S. Williams, deceased, to purchasers of certain portions of said Williams Addition, which deeds are now of record in the office of the County Recorder of Pima County, Arizona, and are hereby referred to for a statement of such restrictions, covenants, agreements, conditions and easements, so far as the said restrictions, covenants, agreements, conditions and easements still remain in full force and effect."

On December 11, 1945, an instrument signed by owners of all of the blocks of Williams Addition, except Blocks 7 and 13 (the park), denominated Appointment of Trustee and Acceptance Thereof, was filed and recorded. A trust deed was also filed conveying the water system to R. C. Stockfleth in trust for the use and benefit of the block owners in the subdivision. The agreement also provided for annual meetings and that a majority of block owners could appoint a new trustee and limit powers of the trustee.

On August 6, 1949, another trust deed was filed and recorded stating that the streets in Williams Addition had been abandoned by action of the Board of Supervisors of Pima County and that by virtue thereof, the various block owners owned the streets. The trust deed conveyed the streets to R. C. Stockfleth in trust for the use and benefit of all property owners in the subdivision for the purpose of maintaining proper means of ingress and egress to and from their respective properties.

On May 13, 1959, there was filed and recorded a Certificate of Change of Trustees executed by Richard B. Ensign as Chairman, and Wade T. Childress as Secretary of the Williams Addition Block Owners Association, naming Childress, Ensign and Mrs. H. Nuzum as the newly elected trustees.

Thereafter, on December 20, 1960, a deed was executed conveying to appellant Block 5 of Williams Addition, except a certain right of way described therein. The deed contained the following language:

"SUBJECT TO:

\* \* \* \* \* \*

"Rights and interest of all other owners of Blocks in Williams Addition in and to Block 13 as a park, and in that portion of Block 25, set aside and reserved for a well site and pumping plant.

\* \* \* \* \* \*

"Restrictions, conditions and covenants, including a reversionary clause, contained in instrument recorded July 16, 1936, . . .; and by instrument of record in Book 92 of Miscellaneous Records, page 321, in Book 222 of Deeds, page 257, and by instrument recorded May 26, 1944, in Book 267 of Deeds, page 309, in Book 289 of Deeds, page 530, and recorded March 9, 1946, in Book 296 of Deeds, page 239, and recorded May 18, 1956, in Docket 987, page 138."

On the basis of the foregoing facts, the trial court granted appellees summary judg-

ment and found that the 1929 deed to the Souers created reciprocal rights and duties which pertained to the entire subdivision and that each grantee has a definite interest in the other lots in Williams Addition having rights one against the other in enforcing the restrictions. The question in this appeal is whether the restrictions imposed in the 1929 deed, and subsequent deeds by Mrs. Williams, were intended to create mutually enforceable restrictions among the various grantees or whether they were personal covenants between Mr. and Mrs. Williams and their respective purchasers.

There has been considerable writing on this subject and "courts are continuously being called upon to determine the problems arising from the imposition of restrictive covenants." Palermo v. Allen, 91 Ariz. 57, 63, 369 P.2d 906, 911 (1962). The reason is clear as noted in the Restatement, Property, Scope Note § 522 (1944), page 3162:

> "The subject of promises respecting the use of land derives its chief significance for the law of property from the fact that the benefit of such a promise may be realized by others than the original promisee and the burden may come to rest upon others than the original promisor."

 Our Supreme Court has noted that some assistance may be gained in arriving at a proper solution of cases involving restrictive covenants by recognizing that such covenants may be divided into three classes. In O'Malley v. Central Methodist Church, 67 Ariz. 245, 250–251, 194 P.2d 444, 448 (1948), the Arizona Supreme Court quoted from Korn v. Campbell, 192 N.Y. 490, 85 N.E. 687, 689, 37 L.R.A.,N.S., 1, 127 Am.St.Rep. 925, as follows:

> "' * * * For the particular purposes of this case such covenants may be broadly divided into three classes. In the first class may be placed those which are entered into with the design to carry out a general scheme for the improvement or development of real property. This class embraces all the various plans, generally denominated in the English cases as 'building schemes,' under which an owner of a large plot or tract of land divides it into building lots, to be sold to different purchasers for separate occupancy, by deeds which *contain uniform covenants* restricting the use which the several grantees may make of their premises. In such cases the covenant is enforceable by any grantee as against any other, upon the theory that there is a *mutuality of covenant and consideration,* which binds each and gives to each the appropriate remedy. Such covenants are entered into by the grantees for their mutual protection and benefit, and the consideration therefor lies in the fact that the diminution in the value of the lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract. (Citing cases.) The second class embraces those cases in which the grantor exacts a covenant from his grantee, presumptively or actually, for the benefit and protection of contiguous or neighboring lands which the former retains. In such cases the grantees, * * * cannot enforce the covenant as against each other, although the grantor or his assigns of the property benefited may enforce it against either or all of the grantees of the property burdened with the covenant. (Citing cases.) Then there is a third class, where there are mutual covenants between the owners of adjoining lands, in which the restrictions placed upon each produce a corresponding benefit to the other, and in such a case of course, either party or his assigns may invoke equitable aid to restrain a violation of the covenant. (Citing case.)' (Emphasis supplied.)"

The issue in this case is whether the restrictive covenants contained in the 1929 Souers' deed, and deeds conveyed subsequent thereto, fall within the first or second class noted above. The trial court concluded that the facts of this case bring it within the first category, i.e., covenants

designed for the purpose of carrying out a general plan or scheme for the improvement and development of Williams Addition.

The rules of law regarding construction of restrictive covenants appear reasonably clear although their application to diverse factual situations has proven problematic.[2] The Arizona Supreme Court has noted certain rules regarding the law in this area in Palermo v. Allen, supra, at 91 Ariz. 64–65, 369 P.2d 911–912:

"Restrictive covenants which equity enforces between purchasers inter sese are those that have been imposed by a common vendor or the original owner of a tract of land in pursuance of a general plan for the development and improvement of the property. [Citing cases.] An action is not maintainable between purchasers not parties to the original covenant where it does not appear that the covenant was entered into to carry out some general scheme or plan for the improvement or development of the property, or it does not appear that the covenant was entered into for the benefit of the land, or it appears that the covenant was not entered into for the benefit of subsequent purchasers, but only for the benefit of the original covenantee. (Citations.)

* * * * * *
" 'It takes two to make a contract. There must be a meeting of the minds of both parties thereto. The mere fact that the vendor in the exaction of uniform building restrictions had in his own mind a general plan or scheme of improvement falls short of establishing even his own intention that such restrictions shall be for the benefit of any one other than himself, and much less does it establish such a meeting of minds between him and his grantee as is necessary to create a contract. Given such intention in the mind of the grantor, there must have co-existed a like intention in the mind of his grantee * * *.' "

The facts previously noted reveal that Mr. and Mrs. Williams jointly executed a deed to Block 21 of Williams Addition in 1929. The deed referred to the filed and recorded map and plat of the subdivision and contained thirteen covenants, conditions, restrictions and reservations. No uniform plan of restrictions was filed with the original plat and plan of Williams Addition nor was there a provision in this first deed that similar covenants, conditions, restrictions and reservations would be included in all deeds subsequently issued to purchasers of property in Williams Addition. Thus, we are required to examine the language of the 1929 deed, to determine whether both parties thereto mutually in-

2. As noted in 26 C.J.S. Deeds § 163, pages 1095–1098 (1956):
"In construing covenants or restrictions as to the use of property, each case must stand by itself, since the facts differ so widely in each one, and each must be decided on the merits, in view of its facts. The circumstances and conditions surrounding the parties and property must be considered, as well as the manifest objects or purposes of the grant or restriction. So, the intent of the parties and 'the object of the deed or restriction should govern, giving the instrument a just and fair interpretation. In other words, effect is to be given to the intention of the parties,' as shown by the language of the instrument, considered in connection with the circumstances surrounding the transaction, and the object had in view by the parties, since the primary object in construing restrictive covenants should be to effectuate the legitimate desires of the contracting parties. The grantor's intention may be ascertained from the restricting words themselves or from those words taken in connection with other words in the deed, and the intention of the parties must be gathered from the entire context, rather than from isolated words. In interpreting a restriction, it has been held that the same logical processes would be applied as in interpreting statutes. Ambiguous restrictions may be interpreted in the light of a general plan, and should be so construed as to assure a reasonable use of the property for legitimate purposes."

tended to create binding restrictions on all property with mutually enforceable rights as among the various grantees because of a general plan or scheme for the improvement and development of the subdivision. If mutually enforceable covenants were created in this case, they must have been created in the first conveyance by deed in 1929.

"It is undoubted that, when the owner of a subdivided tract conveys the various parcels in the tract by deeds containing appropriate language imposing restrictions on each parcel as part of a general plan of restrictions common to all the parcels and designed for their mutual benefit, mutual equitable servitudes are thereby created in favor of each parcel as against all the others. The agreement between the grantor and each grantee in such a case as expressed in the instruments between them is both that the parcel conveyed shall be subject to restrictions in accordance with the plan for the benefit of all the other parcels, and also that all other parcels shall be subject to such restrictions for its benefit. In such a case the mutual servitudes spring into existence as between the first parcel conveyed and the balance of the parcels at the time of the first conveyance." Werner v. Graham, 181 Cal. 174, 183 P. 945, at 949 (1919).

In Werner v. Graham, supra, the California Court held that since the deeds did not recite that the restrictions were intended to inure to the benefit of all other lot owners, each lot owner was not entitled to enforce the covenants against other lot owners under a theory of a general plan for the development and improvement of the property. The court stated that the written instruments "constitute the final expression of their understanding" and although the grantor undoubtedly had in mind a general scheme for the development of the property, such fact is irrelevant unless the intent was

mutual and so expressed in the written instruments.

In the case before us, the trial court found that "Read as a whole the original deed indicates clearly that there is a very comprehensive and interrelated plan for the development of the Williams Addition," and that "all of the lots in the Williams Addition have rights one against the other in enforcing these restrictions and that this intent has been expressed by 'plain and unmistakeable implication'." We believe that the map and plat of the subdivision filed by the Williams, as well as the original deed executed to the Souers, clearly indicate that Mr. and Mrs. Williams intended the creation of an exclusive residential subdivision; we must determine whether the original grantees had a similar intent.

Examining the 1929 deed from Timothy and Alice Williams to the Souers, it is to be noted that the property description refers to the map and plat of Williams Addition "on file and of record in the office of said County Recorder of Pima County, Arizona, * * *." By virtue of this deed, title to a $\frac{1}{24}$th interest in the water system passed to the Souers on condition that when the owners of a majority of the blocks so requested, each owner would convey his interest therein to a trustee who would operate the system for the use and benefit of all owners of blocks in the subdivision. The deed also conveyed a $\frac{1}{24}$th interest in the park located in the center of the subdivision "in trust, however, solely to be used as such park during the period and term of the conditions and restrictions hereinafter set forth, to-wit: until January 1st, 1978."

These provisions can only have significance if it was contemplated by both parties that the recorded plat and conveyance of a fractional interest in the water system and park area were part of a general plan for the development of the subdivision and that each owner of the 24 blocks in Williams Addition would receive similar interests and be bound by

similar burdens so that the plan could be carried out. The deed contains both benefits and burdens by such provisions and they would be meaningless unless it was understood and intended that all subsequent deeds would contain similar benefits and burdens.

Thereafter follow the thirteen numbered paragraphs containing the "conditions, restrictions, covenants, and reservations," in which the term "said property" is apparently used interchangeably to mean both the particular block (Block 21) to which title passed by this deed, as well as the entire Williams Addition. Paragraph 7 provides:

"7. No part of said property shall be sold, conveyed or leased in whole or in part, to any person of African or Asiatic descent, or to any person not of the White or Caucasian race. No part of said property shall be used, or occupied, or permitted to be used or occupied, in whole or in part, by any person of African or Asiatic descent, or by any person not of the White or Caucasian race, except such person as may be employed thereon as domestic servants *by the owners or tenants of any blocks in said property.*" (Emphasis supplied.)

Since the property conveyed could not be subdivided further, the last sentence of Paragraph 7 could have no meaning unless it referred, by the term "said property," to the entire Williams Addition. It would be difficult to derive any other intent from the use of such language.

Paragraph 8 provides:

"8. No structure whatever other than one first class private, one-family residence with the customary out-buildings, shall be erected, placed, or maintained *on any block in said property.*" (Emphasis supplied.)

The obvious meaning of the term "said property" in this paragraph is reference to the entire Williams Addition and not merely to the estate passed by virtue of this deed. Paragraphs 11, 12 and 13 provide:

"11. Any building erected or placed upon any part of said property and every part thereof, except the front steps and roof projection at the eaves thereof, shall be located not closer than fifty (50) feet to the front property line of the *blocks* upon which the same is placed or constructed. In other words, all buildings upon any part of *said property* shall be set back at least fifty (50) feet from the street (meaning thereby, any street, including side streets as well as streets upon which the *respective blocks* front).

"12. In connection with any residence construction and the use thereof as hereinbefore in this deed recited, there shall be constructed *in each block by the owner thereof* at the time of construction of any residence building and placed in operation at the time of the completion of any such residence building, a septic tank of proper design and capacity fully to care for the needs of said residence.

"13. The real estate hereinbefore described shall not be subdivided into lots or parcels, nor shall any conveyance or transfer of less than the whole block be made to any person. This restriction shall not apply to block twenty-four (24) upon which the well and pumping apparatus are located and as to this block the site of said well and pumping apparatus with a sufficient area of ground about them may be set off from said block and as a parcel of the same, from which is also set off and retained by grantors the following real estate, to-wit: (description follows)." (Emphasis supplied.)

We agree with the trial court that "in paragraphs numbered 7, 8, 11, 12 and 13 there are various words in each of said paragraphs which cannot be given any proper meaning unless the words 'said property' be construed to refer to the Williams Addition." We conclude that by the inclusion of these paragraphs it is obvious that the grantor had in mind a comprehensive plan for the development

of the subdivision and intended to create mutually enforceable covenants between the various grantees and not personal covenants binding only these particular grantees.[3] Admittedly the grantor's intent alone is not sufficient since it is the mutual intent of both grantor and grantee that is important. We are of the opinion, however, that the language clearly implies that the land was being conveyed under a general plan of improvement, that the land was subject to the benefits and burdens resulting therefrom, and that both grantors and grantees understood and intended that mutually enforceable equitable servitudes were created by the deed so as to render the restrictions effective in carrying out the general plan. As noted by our Supreme Court in O'Malley v. Central Methodist Church, supra, at 67 Ariz. 257, 194 P.2d 452, quoting from Scull v. Eilenberg, 94 N.J.Eq. 759, 121 A. 788 (1923):

> " 'The burden follows the benefit' * *. When there is no benefit there should be no burden. If the benefit be destroyed the burden should end."

The covenants would be of no value to these grantees if it was not understood and intended that the numbered restrictions were applicable to Williams Addition as a general plan for the improvement and development of the subdivision whereby each block owner would have the power to enforce the restrictions. Any other conclusion would render these covenants largely meaningless and result in subjecting the property obtained by the Souers to the burdens of the restrictions without the corresponding benefits.

Thereafter, the deed contains the following paragraph which is of particular significance:

> "The aforesaid conditions and restrictions and each and all thereof shall continue and remain in full force and effect at all times as against ANY OWNER OF ANY OF THE SAID PROPERTY, * * *." (Emphasis supplied.)

The plain import of this language cannot be disputed; its obvious meaning was to create a power in any block owner to enforce the restrictions and covenants against "any owner of any of the said property" and not merely to create such power in the grantors. The term "said property" can have no other meaning than Williams Addition as a whole.

Another paragraph in the deed provides for forfeiture in favor of the grantors, their heirs, executors, administrators and assigns, in the event any of the conditions, restrictions and covenants are breached. The appellant urges that this forfeiture provision indicates the intent of the Williams to create personal rights enforceable only by them. However, our Supreme Court stated in O'Malley v. Central Methodist Church, supra, at 67 Ariz. 254, 194 P.2d 450:

> "that restrictions providing for forfeiture only were enforceable as neighborhood restrictions on the ground that the evidence established beyond doubt a plan or scheme of improvement for the benefit of each lot owner."

We believe the facts of this case and the language of the Souers' deed show such a plan or scheme of improvement for the benefit of each lot owner.

---

3. See 26 C.J.S. Deeds § 167(3), page 1156 (1956), wherein it is stated:
"An agreement that restrictions shall be for the benefit of the owners of other property in the tract or subdivision may be inferred from the circumstances and terms of the instrument and need not be expressed either verbally or in writing, and a strong circumstance indicating that the restriction is not for the mere personal benefit of the grantor may be found in the fact that it operates to enhance the value of his adjacent premises, whether retained by him or conveyed to others and to serve as an inducement to purchasers." See also, Virgin v. Garrett, 233 Ala. 34, 169 So. 711 (1936).

·Two additional· provisions indicate a ·mutual intent to cause the restrictions and covenants to run with the land since it is stated:

"\* \* \* but said provisions, conditions, restrictions, and covenants shall be binding upon and effective against *any* such mortgagee or trustee or *owner,* thereof whose title thereto or whose grantor's title is, or was, acquired by foreclosure, trustee's sale, *or otherwise.*

"The.terms, conditions, restrictions, covenants and agreements ·herein contained *shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto."* (Emphasis supplied.)

·These provisions indicate the intent to create covenants running with the land which are mutually beneficial, mutually prohibitive and mutually enforceable by the various grantees. ,

. Summarizing what we believe to be the law applicable to the case before us, we .quote from our Supreme Court in O'Malley v. Central. Methodist Church, supra, at 67 Ariz. 257, 194 P.2d 452, citing the language of DeGray v. Monmouth Beach Club House Co., 50 N.J.Eq. 329, 24 A. 388 (1892): .

" ' "The law, deductible from these principles and the authorities, applicable to this case, is. that where there is a general scheme or plan, adopted and made public by the owner of a tract, for the development and improvement of the property, by which it is divided into streets, avenues and lots, and contemplating a restriction as to the uses to which buildings or lots may be put, to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser, and it appears, by writings or by the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof, and the covenants· are actually inserted in all deeds for ·lots sold in pursuance of the plan, one purchaser and his assigns may enforce the covenant against any other purchaser and his assigns, if he has bought with knowledge of the scheme and ·. the covenant has been part of the subject-matter of his purchase. The right of action from this would seem to be dependent as much on the fact of the general scheme as on the covenant—\* \* \*" ' "

. We believe the Souers' deed and the facts surrounding that conveyance evidence ·a scheme for the development of an exclusive residential subdivision, and that the covenants, conditions and restrictions were mutually intended to effectuate this scheme by creating mutually enforceable rights as among the various grantees. Identical provisions were included in subsequent deeds executed by the Williams and were also included by reference in all deeds executed thereafter, including the appellant's deed. Thus, this is not a case where the owners of a subdivided tract of land convey lots from time to time and include in the various deeds restrictive covenants almost identical in form from which, in some cases at least, it has been held that, taken all together, such facts establish mutually enforceable equitable servitudes although nothing exists in any single deed to indicate an intent to create such reciprocal rights. See Werner v. Graham, supra, and cases cited therein. This is a case, however, in which both grantor and grantee mutually intended the creation of reciprocal rights and burdens by virtue of the first conveyance of property in Williams Addition thereby creating in the Souers the power to compel the inclusion of similar provisions in all subsequent deeds. As concluded by the trial court, and with which we agree, "no equity court would have permitted the Williams" to sell "other lots in the subject subdivision without the same being encumbered and/or restricted by the covenants and provisions contained in said deed."

.We realize that restrictive covenants are· to be strictly construed and that "[i]n determining whether land is included in a building scheme doubts are to be resolved in. favor of the free use and enjoyment of the property and against restric-

tions". Palermo v. Allen, supra, at 91 Ariz. 68, 369 P.2d 914.[4] We do not believe that "doubts" exist in this case, since, as noted, the original deed contains sufficient language to indicate that the contract contemplated the creation of mutually enforceable rights and burdens. We have also noted that a building scheme or plan for the development of a subdivision exists by virtue of express contracts between the subdivider and his grantees and where the contracts do not include reference to a set of recorded covenants, conditions and restrictions made applicable to the entire subdivision, they are mutually enforceable only if such intent on the part of both grantor and grantee is found by clear language in the deeds.

We believe that there was sufficient evidence to support the trial court's judgment that the 1929 deed satisfied these requirements and see no basis for reversing that judgment. The plain and unmistakable implication from the language of the 1929 deed and subsequent deeds, and the map and plat of Williams Addition filed in 1927, is that a highly exclusive residential subdivision was intended and that to insure such, the benefits and burdens of the covenants were mutually intended between grantors and grantees to create mutually enforceable rights among the various grantees.

Having so concluded, we find nothing in the facts and circumstances since the time of the original deed to the Souers in 1929 to alter the effect as to the benefits and burdens of the covenants contained therein. Furthermore, the intent to create an exclusive residential subdivision has materialized and the conduct of property owners in that subdivision in executing trust deeds of their respective interests in the park, water system and roadways for the benefit of the subdivision as a whole, and the manner in which they have occupied and used their properties is totally consistent with the conclusions herein reached. The appellant took title to its property with notice of the restrictions, covenants and conditions and is bound thereby.

The judgment of the trial court is accordingly affirmed.

HATHAWAY, J., concurs.

NOTE: Judge JOHN F. MOLLOY having requested that he be relieved from consideration of this matter, Judge ANTHONY T. DEDDENS was called to sit in his stead and participate in the determination of this decision.

4. 26 C.J.S. Deeds § 163, pages 1098–1102, (1956), states:

"Restrictive covenants have been required to be strictly or narrowly construed, or enforced within close confines. More precisely, they are to be construed most strongly or most strictly against the grantor and persons seeking to enforce them, and liberally in favor of the grantee, or in favor of freedom, or free use, of the land, all doubts or ambiguities being resolved in favor of a free use of property and against restrictions. One seeking to enforce a restriction has the burden of demonstrating that his version of it should be sustained, or is sustained by the plain and natural interpretation of its language, or that the activity objected to is within the terms of the restriction.

"This rule of strict construction, however, obtains only where the parties have failed to express their meaning with sufficient clarity to enable the court to say that the construction of the deed is plain and admits of no doubt; the rule will not be applied to defeat the obvious purpose of the restriction, or the obvious intention of the parties, even though not precisely expressed, nor does it require an unnatural and strained construction of the words used; and before giving effect to the rule the court will have recourse to every aid, rule, or canon of construction to ascertain the intention of the parties, since it is the duty of courts to enforce, not to make, contracts."

528

ANTHONY T. DEDDENS, Superior Court Judge (dissenting).

I am unable to concur with the majority of this court.

In Palermo v. Allen, 91 Ariz. 57, 369 P.2d 906, (1962) (hereinafter referred to as *Palermo*), the Supreme Court of Arizona held that every deed must be construed as of the time it is given, not of a later date. In Corn v. Branche, 74 Ariz. 356, 249 P.2d 537, (1952), our Court ruled that "the fundamental rule is that the intention of the parties is arrived at by the language contained within the instrument" (referring to a deed).

My colleagues do not cite either of these cases, but they recognize this principle when they state in the majority opinion that:

"If mutually enforceable covenants were created in this case, they must have been created in the first conveyance by deed in 1929."

They could only have been referring to the deed from Mr. and Mrs. Williams conveying Block 21 of Williams Addition to the Souers.

Although none of the parties in the trial court relied upon estoppel and the trial court did not make its ruling based upon estoppel, the majority rely upon facts and events occurring as late as 1949. Because of many references by the majority to matters of fact occurring so long after the first deed was executed, it is necessary that we set forth the facts in their true light as they existed at or about the time of the execution of said deed and to discuss the extraneous facts which have influenced the majority to show their lack of relation to the principles of law applicable to this case.

At the trial level, both plaintiff and defendants moved for summary judgment, which motions were supported by affidavits, and, upon oral argument of the respective motions, counsel submitted various exhibits in support thereof. On October 24, 1962, the trial court wrote a memorandum opinion based on which judgment was entered against the plaintiff R & R Realty Co., a corporation, adjudging that the restrictions set forth in the deed dated April 19, 1929, from Timothy S. Williams and wife to Clark H. Souers and wife were valid, existing, and in effect and that they constituted covenants running with and attached to the land and were enforceable by the owners of each of the blocks of land in the Williams Addition and that they governed the use and enjoyment of the real property belonging to plaintiff, to-wit: Block 5. Plaintiff appeals from this judgment.

UNDISPUTED FACTS BASED ON AFFIDAVITS, ADMISSIONS, ANSWERS TO INTERROGATORIES AND EXHIBITS.

A statement of the undisputed facts relative to this case is as follows:

(1) On July 13, 1927, Timothy S. Williams and Alice W. Williams, husband and wife, were the owners of 160 acres of land, more or less, lying east of Tucson and on said date duly acknowledged by their signatures a subdivision plat, entitling the same "Map of Williams Addition". The only dedication on the face of this map was a dedication of "all the thoroughfares shown to the public use forever".

Block 5, the subject matter of this action, was a block consisting of 3.16 acres before certain portions thereof were taken for the widening of Broadway Avenue in the City of Tucson. Block 5 fronts on Broadway Avenue, Tucson.

(2) The map of Williams Addition was duly recorded in the Pima County Recorder's Office in Book 5 of Maps, at page 11, in September 1927.

(3) The subdivision map makes no reference to any restrictions, covenants or conditions concerning the use of the said premises or any of said blocks.

(4) The owners of said land did not file of record any declaration of covenants, restrictions or conditions governing the use of and applicable to the blocks in Williams Addition subdivision at or about the time of recording said map or at any time thereafter.

(5) The owners of said land did not file of record any agreement to make any covenants, conditions or restrictions applicable to the use of all or any of the blocks of said subdivision.

(6) The owners of said land did not file of record any agreement that they would place in each deed to the blocks of said subdivision any covenants, restrictions or conditions governing the use of said Williams Addition.

(7) The owners of said land did not incorporate in the first deed (or for that matter in any deed thereafter) any agreement between them and their grantees that they would insert the same covenants, restrictions or conditions as a part of and applicable to all other deeds to all blocks in said subdivision similarly situated.

(8) On April 19, 1929, about two years after recording the map, the said Williams and wife conveyed the first of the blocks of said Williams Addition and the only one which was conveyed by both original subdividers. This was a conveyance of Block 21 to Clark H. Souers and wife, together with a 1/24th interest in the "well and equipment and water system located on said addition" and together with a 1/24th interest in "and to that certain park located in the center of the aforesaid addition" (referring to the park mentioned in the majority opinion).

(9) Said first deed to the Souers contains the following language in the habendum clause:

"TO HAVE AND TO HOLD, all and singular, the above described premises, together with the appurtenances and privileges thereunto incident, unto the said parties of the second part, their heirs and assigns forever.

*"The property herein described is sold and conveyed under the conditions, restrictions, covenants and reservations, hereinafter set forth,* which are hereby accepted and agreed to by the grantees herein to-wit: * * *."

(Then follow thirteen separate clauses setting forth certain conditions, restrictions, covenants, and reservations referred to in paragraph 10 hereafter. Clauses 7, 8, 11, 12 and 13 are quoted in the majority opinion.)

(The habendum clause concludes.)

"The aforesaid conditions and restrictions and each and all thereof shall continue and remain in full force and effect at all times as against any owner of any of the said property, however his title thereto may be acquired until January 1, 1978, on which date the said conditions and restrictions and each and all thereof, shall terminate and end, and thereafter be of no further legal or equitable affect on the said property or any owner thereof, except that the restrictions referring to persons of African or Asiatic descent and to persons who are not of the White or Caucasian race shall be perpetual.

"The foregoing restrictions shall be deemed and held to be conditions upon which the property herein described is conveyed, and a breach of said restrictions or any of them, if continued for a period of sixty (60) days after notice of the same to the vendee, shall work a forfeiture and termination of all right, title, interest, claim and demand of the vendee in and to the aforesaid property and the whole thereof, and it shall revert to the grantors with right of immediate re-entry and possession. Provision hereof shall apply to the heirs, executors, and assigns of the parties hereto."

(Then follows a saving clause which holds any mortgage or deed of trust made in good faith harmless against the forfeiture clause set forth in the immediate preceding paragraph.) (Italics supplied.)

(10) The thirteen clauses of covenants, conditions and restrictions in said deed to the Souers deal entirely with the use of said Block 21, providing generally that it shall be used for private residence only, no business thereon, no billboards or advertising, no drilling for oil, no derricks or similar structures, no temporary housing or garage dwellings thereon, no cattle, no sheep, etc., to be kept thereon, the property was not to be sold to anyone other than of the White or Caucasian race, only a first-class private family residence of a value of at least $10,000.00 to be constructed thereon, and to be constructed and erected in accordance with the building code of the City of Tucson, setting forth also restrictions as to the setback from the street frontage of all buildings, requiring a septic tank on each block and providing that said block shall not be subdivided into any further lots or parcels.

(11) There is nothing in any of said thirteen clauses which can be construed to be a contract between grantors and grantees that grantors will impose the same covenants, conditions and restrictions upon all other blocks in said subdivision nor is

there anything in any of said thirteen clauses which can be construed to give grantees the right to enforce compliance with the said covenants, conditions and restrictions against any other blocks in said subdivision.

(12) After this one deed to Block 21 was executed and recorded, Timothy S. Williams died, his estate was probated and thereafter distributed to his widow, no reference being made in the decree of distribution to the covenants, conditions or restrictions set forth in the deed to Block 21 (the Souers deed). The decree of distribution described the land as:

"Williams Addition to the City of Tucson, Pima County, Arizona, except Block 21 thereof."

(13) After distribution of the estate, the widow of Timothy S. Williams conveyed Blocks 7, 23, 8, 12, and 20, (including an undivided ½₄th interest in the well and park as above outlined) on various dates between April 23 and November 14, 1936; each of these deeds contained the same identical language set forth in paragraph 9 above and substantially the same thirteen clauses referred to in paragraph 10 above. The matters stated in paragraphs 9 and 10 above were all true with respect to each of these five deeds so recorded and executed by Mrs. Williams. The matters set forth in paragraph 11 above apply equally as well to the five deeds referred to in this paragraph.

(14) Thereafter Mrs. Williams died and her estate was probated and the decree of distribution in her estate described the remaining blocks in Williams Subdivision without any reference to any conditions, covenants or restrictions.

(15) Thereafter one of the distributees of Mrs. Williams' estate filed a partition suit in Pima County Superior Court on October 26, 1938, and on December 8, 1938, an amended complaint was filed. Neither the original nor the amended complaint made any claim or assertion that the remaining blocks of Williams Addition were subject to any covenants, conditions

or restrictions whatever. Block 5, the subject of this action, was one of the blocks included in the partition suit.

(16) All of the defendants in said action were served and default was entered against each and all of the defendants therein on the said amended complaint. Judgment was taken on April 10, 1939, ordering the property, including Block 5, to be sold, no mention whatever being made that the sale of the blocks was subject to any restrictions, covenants or conditions and none were referred to in the judgment of the court.

Thereafter on June 5, 1939, on motion of counsel for plaintiff, *but without any additional pleading being filed and without any additional service or notice of any kind being given to any of the defaulted defendants, the court made and entered a modified and amended judgment* in which it was ordered, adjudged and decreed that the said real estate, including the said Block 5, (and Block 13, which was not mentioned in any of the pleadings) be sold in one parcel and that the deed to be given shall contain the following provisions and restrictions, to-wit:

"This deed conveys to the purchaser the property hereinbefore described, subject to any and all restrictions, covenants, agreements, conditions and easements contained in the deeds heretofore given by Timothy S. Williams and Alice W. Williams, his wife, or by Alice W. Williams, as distributee under the decree of distribution of the estate of Timothy S. Williams * * *."

(17) On July 24, 1939, the court commissioner executed and recorded his deed selling the property, including Block 5, to one buyer, which deed recited that:

" * * * the said sale was made subject to all the restrictions, covenants, and agreements, conditions and easements contained in the deed heretofore given by Timothy S. Williams and Alice W. Williams, his wife, or by Alice W. Williams to purchasers of certain portions of said Williams Addition, which deeds

are now of record in the office of the County Recorder of Pima County, Arizona, and are hereby referred to for a statement of said restrictions, covenants, agreements, conditions and easements, *so far as the said restrictions,* covenants, agreements, conditions and easements *still remain in full force and effect.* * * *" (Italics supplied.)

(18) In the deed whereby Appellant acquired its title to the said Block 5 of Williams Addition, the following language appears after the description of said block:

"SUBJECT TO:"

(Non-applicable paragraphs eliminated.)

"Restrictions, conditions and covenants, including a reversionary clause, contained in instrument recorded July 16, 1936, in 190 Deeds, page 592; and by instrument of record in Book 92 of Miscellaneous Records, page 321, in Book 222 of Deeds, page 527, and by instrument recorded May 26, 1944, in Book 267 of Deeds, page 309, in Book 289 of Deeds, page 530, and recorded March 9, 1946, in Book 296 of Deeds, page 239, and recorded May 18, 1956, in Docket 987, page 138."

## THE LAW APPLICABLE TO THIS CASE.

In any discussion of the rules of law applicable to this case, there are several basic premises which must be kept in mind.

The first premise is that a building scheme or plan applicable to an entire subdivision exists only because of an express contract made between the subdividers and their grantees, and, if the contract does not arise from a set of covenants, conditions and restrictions recorded by the subdividers and made applicable to the entire subdivision, it must be found in the first deed between the subdividers and their grantees.

The second premise is that the intent of the parties to make the covenants and restrictions run with the land and be for the benefit of each and every lot owner must plainly appear from the language in the deed because it must be contracted between the parties.

The third premise is that every deed must be construed as of the time it is made and not as of a later date; and the construction must be found in the language of the deed itself.

The fourth premise is that in construing a deed, all doubts must be resolved in favor of the free use and enjoyment of property and against the restriction of property.

The fifth premise is that restrictive covenants are presumed to be for the benefit of the grantor alone in the absence of evidence to the contrary and the burden of showing that such covenants run with or are appurtenant to land is on the party claiming the benefit of the restrictions.

All of these principles are clearly enunciated and supported in the law of Arizona beginning with the case of McRae v. Lois Grunow Memorial Clinic, 40 Ariz. 496, 14 P.2d 478, (1932), (hereinafter referred to as *McRae*) and in the subsequent cases of O'Malley v. Central Methodist Church, 67 Ariz. 245, 194 P.2d 444, (1948), (hereinafter referred to as *O'Malley*); Smith v. Second Church of Christ, Scientist, Phoenix, 87 Ariz. 400, 351 P.2d 1104, 84 A.L.R.2d 766 (1960), (hereinafter referred to as *Smith*); and concluding in *Palermo,* supra, in 1962.

Although the majority seek to construe the words "said property" as found in clauses 7, 8, 11, 12, and 13 of said restrictions, as applying to all of the blocks of Williams Addition and implying therefrom a mutual agreement upon the part of the grantees Souers that mutually enforceable equitable servitudes were created by the deed so as to render the restrictions available to each subsequent grantee against any other or prior grantee, it is a construction which is not justified because the thirteen clauses setting forth the condi-

tions for the use of land are prefaced with the words:

> *"The property herein described* (which refers only to Block 21) is sold and conveyed under the conditions, restrictions, covenants, and reservations hereinafter set forth, which are hereby accepted and agreed to by the grantees herein, to-wit:" (Italics supplied.)

and which habendum clause is concluded with the following clearly expressed contract:

> "The foregoing restrictions shall be deemed and held to be conditions upon which the property herein described is conveyed, and a breach of said restrictions or any of them, * * * shall work a forfeiture * * * of all * * * title * * * of the vendee in * * * the aforesaid property * * * and it shall revert to the grantors * * *"

None of the references in paragraphs 7, 8, 11, 12, and 13 of said restrictions (being references to "said property") can change this forfeiture clause into a contract between the grantors and the grantees that the said conditions and restrictions are thereby imposed upon each and all of the lots in the said subdivision and that they, the grantors, would insert substantially like covenants and conditions in all subsequent deeds conveying blocks in said subdivision to the end that the Souers and their grantees would have the benefit of said covenants, conditions and restrictions. Likewise, the Souers did not bind themselves through any agreement with the Williams that they would be liable to any grantee of any other blocks in the subdivision because the Souers were not parties to such other deeds. Their only contract was with the Williams and it was a contract whereby they agreed "clearly and expressly" in "plain and unmistakable language" (*Palermo*) that the restrictions in the deed to Block 21:

> "shall be deemed and held to be conditions upon which the property"

is conveyed to them and that

> "a breach of said restrictions or any of them * * * shall work a forfeiture * * * of all of the title in and to (Block 21) and * * * it shall revert to the grantors".

Where, under the facts of this case, have the Appellees upheld the burden of showing that the restrictions in this case run with the land and are for the benefit of each lot owner in the subdivision in the face of the plain and clearly expressed contract found in the forfeiture clause in the Souers deed?

The Supreme Court of Arizona had no difficulty in determining what was sufficient evidence to meet the burden of proof to show that a forfeiture clause did contain adequate language to express the intent of the parties that the restrictions shall apply to each and every lot in a subdivision. In *McRae*, plaintiff's deraigned their title from Phoenix Title & Trust Company, acting as trustee for the owners of the premises. The deed from the trustee contained conditions and restrictions concerning the use of the property (much the same as the thirteen restrictive clauses in the Souers deed), but also contained the following express contract to make the said conditions apply to all of the lots in the subdivision:

> "* * * that *grantor shall insert substantially like covenants* and conditions *in all subsequent transfers of lots* in said Hurley Heights subdivided *made by grantor* * * * *that all covenants,* conditions, and stipulations *herein contained run with the land* and upon the breach of any one thereof the property shall revert to said grantor, its successors or its assigns; * * *." (Italics supplied.)

In all other deeds from the trustee in *McRae,* there were inserted substantially the same conditions and restrictions. Our Supreme Court construed this language, even though in the form of a forfeiture clause, as clearly showing the intention of the parties that the restrictions would run with the land and would be for the benefit of each and

every lot and therefore enforceable by the grantee of each and every lot in the subdivision. At page 503 of the Arizona Reporter, at p. 480 of 14 P.2d, our Court said:

"One of the legal questions involved is whether the restrictions in the deeds from the original grantor were inserted just for the benefit of such grantor or for the benefit of any and every purchaser of a lot in the Hurley Heights Subdivided. We think the restrictive covenants as to the use of the real estate are a part of a general plan or scheme for the development of Hurley Heights Subdivided and for the benefit of all the lots included in the tract and may be enforced by the owner of any lot in such tract against the *restrictions* here run with the land and *were clearly intended to be for the benefit of each and every lot.* They were inserted in all the deeds so that each purchaser took his lot with the benefits and burdens of the plan or scheme of improvement." (Italics supplied.)

In the majority opinion, my colleagues pick up various quotations from *O'Malley, Palermo,* and from Werner v. Graham, 181 Cal. 174, 183 P. 945, at 949 (1919), (hereinafter referred to as *Werner*) and thereby suggest that the Supreme Courts of Arizona and California support their position. A fair consideration of these cases negatives such a conclusion. Indeed, they show that Arizona and California hold contrary to this court.

In *O'Malley* an effort was made to convert a forfeiture clause into one establishing conditions and restrictions applicable to all of the lots in the subdivision because certain recitals appeared in some of the deeds to the effect that the grantors were endeavoring to create a choice and attractive subdivision. A careful reading of *O'Malley* discloses that our Supreme Court did not find a common building scheme to be established because there was nothing but a forfeiture clause in the deed, exactly as in the instant case.

The Supreme Court of Arizona adopted the true theory of *Werner* in the following language on page 254 of 67 Arizona Reports, on page 450 of 194 P.2d, in its opinion in *O'Malley:*

"(5). General building schemes do not come into being gradually by natural evolution. A contract is made and a meeting of minds had. If a building scheme was established at the time of the platting of Los Olivos Amended and the restrictive covenants with the forfeiture provision were agreed upon and inserted in the deeds for the benefit of all lots conveyed, then such covenants would be neighborhood restrictions and be enforceable by all grantees. If not so shown the express terms of the deeds govern."

What were the express terms of the Souers deed? They were:

*"The foregoing restrictions shall be deemed and held to be conditions upon which the property herein described* (Block 21) *is conveyed, and a breach of said restrictions * * * for * * * 60 days * * * shall work a forfeiture and termination of all right* (and) * * * *title, * * * of the vendee in and to the aforesaid property * * * and it shall revert to the grantors * * * with immediate re-entry and possession."* (Italics and parenthetical words supplied.)

Those are the express terms of the Souers deed which govern. They are the only terms of the deed expressly showing the contract and agreement of the parties, *(Palermo),* expressly showing that the contract between the grantors and grantees was that a forfeiture was intended upon a breach. Continuing with the quotation from our Supreme Court in *O'Malley* at the same page above set forth, we find the following:

There is nothing in the evidence showing that the Los Olivos Amended restrictions, that is those containing the forfeiture clause, are other than what they purport to be. In construing such restrictions in the case of Pierson v. Canfield,

Tex.Civ.App., 272 S.W. 231, 233, the court said:

> '* * * It is not intended by this holding to intimate that, in a proper case, restrictions such as these may not also be enforced as covenants by purchasers of other lots under a uniform settlement scheme, but the holding is, that there is nothing in the evidence tending to show that the restrictions are other than what they purport to be, that is to say, conditions subsequent, for the violation of which the grantors, their heirs, and assigns, alone, can claim forfeiture. 12 C.J. 410; Werner v. Graham, 181 Cal. 174, 183 P. [945], 947.'

> * * * * * *

> "(6) *We subscribe to this rule.* In the case of McRae v. Lois Grunow Memorial Clinic, 40 Ariz. 496, 14 P.2d 478, we held that restrictions providing for forfeiture only were enforceable as neighborhood restrictions on the ground that the evidence established beyond doubt a plan or scheme of improvement for the benefit of each lot owner." (Italics supplied.)

What was the evidence in *McRae* that "established beyond a doubt a plan or scheme of improvement for the benefit of each lot owner"? It was the express contract in the first deed providing:

> " * * * that grantor shall insert substantially like covenants and conditions in all subsequent transfers of lots in said Hurley Heights Subdivided made by grantor" and "that all covenants, conditions and stipulations herein contained run with the land * * *"

Thus we can see that for a general building scheme to come into existence in Arizona and to be applicable to all of the lots in the subdivision similarly situated there must be an express agreement between the grantors and grantees to the effect that the covenants, conditions and restrictions will be placed in all of the deeds conveying lots similarly situated in the subdivision and further that where the deed contains only a condition subsequent clause (such as a for-feiture clause in the first deed conveying the first lot in the Williams Addition to the Souers) there is no evidence to show that the restriction is anything more than a forfeiture clause; when you have nothing more than a forfeiture clause, when you have no express agreement to make the same covenants and conditions and restrictions applicable to all lots in the subdivision similarly situated, then "the express terms of the deed govern". That is precisely what the Supreme Court of Arizona held in *O' Malley* when it said "We subscribe to this rule.".

### WERNER IS THE LAW OF ARIZONA

Perhaps this would be a good point at which to discuss *Werner*, quoted with approval by the majority of this court and relied upon by the trial court in this case.

*Werner* also was an action to quiet title to real property, the purpose being to obtain a judicial determination on behalf of plaintiff that his lands were free of certain restrictions which were contained in a deed to a previous owner through whom plaintiff derived his title. The judgment of the trial court was that plaintiff's land was subject to the restrictions and plaintiff appealed.

The Supreme Court of California reversed the trial court, 183 P. 945, 950. It is therefore highly pertinent to inquire into the facts of *Werner* because the holding of the Supreme Court of California in *Werner* is diametrically opposed to the ruling of the majority of this court and the trial court.

The facts in *Werner* appear in the second paragraph of that opinion as follows (183 P. 945, 946.):

> "It appears that one Marshall was, in 1902, the owner of the whole tract, which was at that time unimproved, and in that year he subdivided it into blocks and lots and filed of record a map of the tract as so subdivided. This map showed no building lines or anything else to indicate any purpose of restricting in any way the manner in which the different lots might be built upon or otherwise improved, or

the uses to which they might be put. Immediately following the recording of the map, Marshall began to sell and convey the lots. There were 132 lots in all, and by October 21, 1905, he had sold and conveyed 116 of them, including the lot now owned by the plaintiff. In all of the deeds from Marshall appear restrictive provisions, which, while differing slightly in some instances, dependent upon the location of the particular lot, as, for instance, upon its facing east or west, are yet so uniform and consistent in character as to indicate unmistakably that Marshall had in mind a general and common plan which he was following. The restrictions in the deed by Marshall conveying the plaintiff's lot are typical and read:

'Provided, however, that this conveyance is made upon and shall be subject to the following express conditions, to-wit:'

(Restrictions omitted; the clause concluded.)

'* * * *If the said party of the second part, his heirs, assigns or successors in estate, shall in any way fail to keep or perform the conditions above specified, or in any one of them, in any respect whatsoever, then any and all right, title, interest, and estate hereby granted or conveyed shall revert to and become vested in the said parties of the first part,* their heirs or assigns.

'The said party of the second part [grantee] accepts this deed and conveyance upon and subject to each and all of said conditions herein set forth. It is further understood and agreed that each and all of said conditions and covenants shall run with said premises and shall be binding upon the heirs, assigns and all successors in estate of the said party of the second part.':"
(Italics supplied.)

Accordingly, the factual situation in *Werner* is identical to that of the instant case. Yet the Supreme Court of California reversed the trial court and held that the covenants and conditions in the Marshall

deed were not enforceable against plaintiff's lands as a building scheme because it found nothing more than a forfeiture clause in favor of the grantor in the deed and there was no contract to make the restrictions applicable to all the lots in the subdivision.

The following quotation from the opinion in *Werner,* at page 949 of the Pacific Reporter, shows conclusively that it held exactly opposite to the majority of this court and trial court in the instant case. It is as follows:

"* * * * The intent of the common grantor—the original owner—is clear enough. He had a general plan of restrictions in mind. But it is not his intent that governs. It is the joint intent of himself and his grantees, and as between him and each of his grantees the instrument or instruments between them— in this case, the deed—constitutes the final and exclusive memorial of such intent. It is also apparent that each deed must be construed as of the time it is given. It cannot be construed as of a later date, and, in particular, its construction and effect cannot be varied because of deeds which the grantor may subsequently give to other parties. Yet that is exactly what is done in the decisions holding that mutual servitudes exist in cases where all the deeds taken together evidence anything more than an intent to put particular restrictions on a particular lot. As a concrete instance, take the first deed given by Marshall. At that time there was nothing to evidence any general plan of restrictions, and if the question as to the effect of the deed had arisen then, it must necessarily have been construed as if no such general plan exsited. If it must have been so construed at that time, it must be so construed now. Whatever rights were created by the deed were created and vested then, and the fact that it later appears that Marshall was pursuing a general plan common to all the lots in the tract cannot vary those rights. The same is true of each deed as it was given. Nor does it make any difference that, as

claimed by the defendants, Marshall gave each grantee to understand, and each grantee did understand, that the restrictions were exacted as part of a general scheme. Such understanding was not incorporated in the deeds, and, as we have said, the deeds in this case constitute the final and exclusive memorials of the understandings between the parties. Any understanding not incorporated in them is wholly immaterial in the absence of a reformation. (Authorities omitted.)

"This whole discussion may in fact be summed up in the single statement that, if the parties desire to create mutual rights in real property of the character of those claimed here, they must say so, and must say it in the only place where it can be given legal effect, namely, in the written instruments exchanged between them, which constitutes the final expression of their understanding. It follows that the additional element mentioned—that Marshall exacted similar restrictive covenants from all the grantees of lots in the tract—does not affect the matter and cannot change the conclusion reached without it. That conclusion, as before expressed, is that the restrictions in the deed by Marshall to the plaintiff's predecessor in interest ran personally to Marshall and not to the other lots in the tract, and that the defendants, who claim wholly as lot owners, did not acquire the right to insist upon these restrictions * * *"

While the majority of this court and the trial court have paid lip service to *Werner* and *Palermo,* both have rejected the principles of those cases. *Werner* is recognized by the Arizona Supreme Court as the leading case on the subject of how to create and establish a neighborhood scheme or plan and what is required to impose an equitable servitude upon each and every lot in a subdivision.

In *Smith,* our Supreme Court at page 409 of 87 Arizona Reporter, 351 P.2d 1104 quoted with approval four columns of text from the opinion of the Supreme Court of California in *Werner,* including many of

the quotations set forth herein and Arizona again pronounced *Werner* as the law of Arizona.

It is true that there are some states which take a more liberal viewpoint of what is necessary to create equitable servitudes upon all of the lots in a subdivision, some even going so far as to make the restrictions in each grantee's deed binding on the remaining land even though there is no covenant by the grantor to bind the remaining land, if in fact there was a general scheme or plan apparent to enable restrictions to be enforced. See Thompson on Real Property, 1962 Replacement Volume 7, § 3163, page 125. This same authority on real property thoroughly understands the doctrine of *Werner* and its full significance as developed in the California authorities, for at page 126 of the same Volume 7 of Thompson, supra, there appears in footnote No. 41 the following statement:

"It appears that to constitute a 'common building scheme' in California, the 'building scheme' deeds must contain: (1) an express covenant by the grantee to be bound by the restrictions, (2) a statement to the effect that the covenant is exacted for the benefit of all the property owners in the area, (3) an express statement that a general plan of restrictions is being set up, (4) a clear designation of the dominent estate, and (5) an express agreement by the grantor to impose similar restrictions on the other land owned by him and to place such restrictions in all of his deeds. Werner v Graham, 181 Cal. 174, 183 P 945; Wayne [Wing] v Forest Lawn Cemetary Association, 15 Cal.2d 472, 101 P2d 1099, 130 ALR 120, 14 So.Cal.L.Rev. 191."

None of these requirements designated (2), (3), (4), and (5) in footnote 41, supra, are to be found in the factual situation of this case. As we have indicated above, *Werner* is the law of Arizona. Both *Werner* and Wing v. Forest Lawn Cemetery Association, supra, are quoted with approval by the Supreme Court of Arizona in *Palermo, Smith,* and *O'Malley,* and all five

of the requirements set forth in the footnote quotation from Thompson on Real Property, Vol. 7, supra, are to be found in the foregoing Arizona cases and in *McRae*.

The majority of this court recognized that it is not sufficient for the grantor to have an intention to establish a general scheme or plan, but that the original grantees must also have a similar intent and must contract specifically to create equitable servitudes binding on all of the lots covered by the plan. In an effort to establish this intent, they point to the portions of the Souers deed dealing with the creation of a water system for the subdivision, and the words "said property" appearing in Paragraphs 7, 8, 11, 12, and 13 of the various restrictions, from which they conclude that the grantor had in mind a comprehensive plan for the development of the subdivision and, without pointing to any express agreement in the deed, they then conclude as follows:

"We are of the opinion, however, that the language clearly implies that the land was being conveyed under a general plan of improvement, * * * and that both grantors and grantees understood and intended that mutually enforceable equitable servitudes were created by the deed so as to render the restrictions effective in carrying out the general plan."

The majority also relies strongly on the language of the habendum clause of the Souers deed which reads as follows:

"The aforesaid conditions and restrictions and each and all thereof shall continue and remain in full force and effect at all times against any owner of any of the said property, however his title may be acquired until January 1, 1978, * * *."

Here again we have nothing more than another reference to the "said property" without any description and which can only refer to "the hereinabove described property" that is, Block 21, the only property described in the Souers deed.

What has the Supreme Court of Arizona said is necessary to establish the intention of the grantees to be bound and to set up equitable servitudes binding against all lot owners? In *Smith*, supra, at page 411 of 87 Arizona Reports, our court quoted with approval from Wing v. Forest Lawn Cemetery, supra, as follows:

"The restrictions must not only appear in one deed, but in all the deeds, and must expressly declare that such restrictions are for the benefit of and run with all other lots in the designated area. In other words, the restrictions must be for the mutual benefit of all parcel owners and each lot imposed with a servitude for the benefit of each and every other lot. It is necessary to state in the deed what is the servient and what is the dominant tenement. See Berryman v. Hotel Savoy Co., 160 Cal. 559, 117 P. 677, 37 L.R.A. N.S., 5; Werner v. Graham, 181 Cal. at 174, 183 P. 945; McBride v. Freeman, 191 Cal. 152, 215 P. 678. The intent of the parties to create mutual and reciprocal rights of restrictions between the grantees of the original grantor must appear in the deed. Gamble v. Fierman, 82 Cal.App. [180] at page 182, 255 P. 269."

Applying this language from *Smith* to this case, we could ask:

(1) How can the words "said property" in the five paragraphs above referred to and in the portion of the habendum clause quoted, supra, be said to "expressly declare that such restrictions are for the benefit of and run with all other lots in the designated area"?

(2) How can it be said that the use of the words "said property" disclose a contract that "the restrictions are for the mutual benefit of all parcel owners and each lot imposed with a servitude for the benefit of each and every other lot"?

(3) How can the words "said property" be a description of what is the "servient and what is the dominant tenement"?

(4) Where can it be said that "the intent of the parties to create mutual and recipro-

cal rights of restrictions between the grantees of the original grantor * * * appear in the (original) deed"?

In *Palermo,* supra, our court not only followed with approval the principles stated in Wing v. Forest Lawn Cemetery, supra, as quoted in *Smith,* supra, but likewise held that the intention of the grantees *could not be implied,* but had to expressly appear in the deed. We said in *Palermo,* 91 Ariz. 66, 369 P.2d 906, 912, as follows:

"It is not enough even if it is admitted that Cowperthwait had a general plan or scheme in mind, for a mere intent on the part of the grantor to establish a general scheme does not govern. O'Malley v. Central Methodist Church, supra; Werner v. Graham, 181 Cal. 174, 183 P. 945 (1919). The intent must be mutual, and is to be ascertained from the language of the deeds, construed in connection with circumstances existing at the time."

And again at page 69 of the Arizona Reports, at page 915 of 369 P.2d, our court said in *Palermo:*

"The intention of both parties to a particular deed must have been to impose equitable servitudes. O'Malley v. Central Methodist Church, supra. That the grantor may have had such an intention may possibly be implied from his insertion of restrictions in all deeds, *but the intention of the grantee who was not a party to the deeds to other parcels obviously may not be so implied.* Pierson v. Canfield, supra.

"The intention of the parties should be determined by a fair interpretation of the grant or reservation creating the easement. As was said in Berryman v. Hotel Savoy [citations omitted]:

'It seems to us that in all these cases it is better to get at the intention * * * from the language of the deed, interpreted in the light of the attending circumstances, than to conjecture the intent from the circumstances, and then to make the language of the deed bend to that.'" (Italics supplied.)

Indeed, in the instant case, we could paraphrase the language of our Supreme Court in *Palermo* (beginning at the bottom of page 69 of the Arizona Report and concluding on page 70, on page 915 of 369 P.2d) as follows:

"In the present case, and referring to the Souers deed, there is no description of any other lands which might be the dominant tenement. There is no statement that the covenant and restrictions are meant to inure to the benefit of other land. * * * There is no statement that the restrictions are intended to 'run with the land'. There is no covenant by grantor to insert similar restrictions in deeds to subsequent lands later to be conveyed by them. There is a complete lack of language indicating that the restrictions were meant to inure to the benefit of anyone other that the grantor, personally. Indeed, the only express contract made by the grantor and the grantee is that the grantors have a right to forfeit the interest of the grantees for breach of the agreements."

And we could also conclude with the language of our court in *Palermo* at page 70 of 91 Arizona Reports, on page 915 of 369 P.2d where it said:

"(14). Equitable servitudes in favor of one parcel and against another cannot be created in any such uncertain and indefinite fashion. If the parties desire to create mutual rights in real property, they must say so in the written instrument exchanged between them. Werner v. Graham, supra; Martin v. Ray [76 Cal.App.2d 471, 173 P.2d 573], supra; Sailer v. Podolski, 82 N.J.Eq. 459, 88 A. 967 (1913)."

We could again paraphrase the language of our Supreme Court in *Palermo* at page 72 of the Arizona Reports, at page 917 of 369 P.2d and say:

"The evidence does not show that Williams impressed the deed to Souers with restrictions 'for the benefit of all other property in the neighborhood'. It was not so expressed in the deed, * * *

certainly there was no writing 'clearly expressing' that the restrictions were for the benefit 'of all other property in the neighborhood' and we cannot say that such intention was shown by 'plain and unmistakeable implication'."

The only express contract in the Souers deed between the parties as to what would happen if the conditions and restrictions were violated by the vendee is to be found in the forfeiture clause and its plain and simple language must be enforced in accordance with *Smith* and *Palermo*, supra, to provide for a re-entry by the grantors. In Newton v. Village of Glenn Ellyn, 374 Ill. 50, 27 N.E.2d 821 (1940), the Supreme Court of Illinois said:

> "One of the most important considerations in determining whether a clause is a condition subsequent or something else is the presence or absence of a clause providing for re-entry by the grantor or his heirs, or forfeiture of the estate for a breach. (Authorities omitted.) Such a clause, while not indispensable, is always important as evidence of an intent to impose a condition subsequent and will make certain that which, in its absence, is left open to construction. (Authorities omitted.)"

In view of the express forfeiture contract in the Souers deed and the plain language therein calling for a forfeiture of the estate for a breach, the contract between the parties is plain and certain and cannot be left open to construction.

## WHAT IS THE EFFECT OF THE JUDGMENT AND SALE IN THE PARTITION SUIT?

The judgment was entered on April 10, 1939, directing the property to be sold, including Block 5, and followed the complaint and amended complaint and did not declare that any of the land, including Block 5, was subject to any covenants, conditions or restrictions. Thereafter on June 5, 1939, fifty-five days later, and without any additional pleadings being filed or service being had on any of the defaulted

defendants, the court on motion of counsel made and entered a modified, amended judgment in which it was ordered that the land, including Block 5, was to be sold subject to any and all restrictions, covenants, agreements, etc., contained in the deeds theretofore given by Timothy S. Williams and wife or by Alice Williams as his distributee.

The fact that the second judgment was entered without notice to any of the defaulted defendants and that it granted greatly expanded relief not included in the complaint or amended complaint or in the previous judgment, establishes without doubt that the court was completely and wholly without any jurisdiction to render the modified amended judgment on June 5, 1939. One does not need to cite authorities to show that such a judgment is a nullity.

Apparently, the court commissioner who executed the deed on the sale of the property evidently felt the same way because his deeds selling the lots did not follow the judgment, but directed that the sale was:

> "Made subject to all the restrictions, covenants and agreements, conditions and easements contained in the deed heretofore given by Timothy S. Williams and Alice W. Williams, his wife, to purchasers of certain portions of said Williams Addition, * * * *so far as the said restrictions,* covenants, agreements, conditions and easements *still remain in full force and effect.* * * *" (Italics supplied.)

## WHAT ABOUT THE REFERENCE TO THE LATER DEEDS MAKING THE PROPERTY "SUBJECT TO" THE CONDITIONS AND RESTRICTIONS REFERRED TO IN SAID DEEDS?

In *Smith*, our Supreme Court flatly held, at page 408 of the Arizona Reporter, at page 1109 of 351 P.2d, that:

> "(5). The point is that reference to restrictions in a 'subject to' clause will not, without more, make such restrictions

applicable to the deeded property if, as a matter of fact, they are otherwise inapplicable."

Accordingly, the fact that the subject to clauses were added in the subsequent deeds could not create equitable servitudes upon the blocks of Williams Subdivision. Indeed, when the Superior Court of Pima County in the partition suit amended and modified its judgment without any notice to the parties defendant by ordering that the property was to be sold subject to the conditions, covenants and restrictions contained in the original deed by Timothy S. Williams and wife to the Souers, it did exactly what the trial court and the majority of this court did. It "created" a contract which the subdividers and their grantees never made and by virtue of said "contract" attempted to impose an equitable servitude on each and all of the blocks in Williams Addition, making each block a servient estate and each block a dominant estate with respect to the other blocks in the subdivision. Courts do not have authority to make "contracts" which the parties themselves did not make, nor to impose equitable servitudes upon real property in such manner.

The doctrine of *Werner* has been recognized as sound law by Arizona courts since *McRae* in 1932 when it was first mentioned in an Arizona opinion (as far as this writer knows) and is without doubt the basic fundamental law adopted by our Court in *O'Malley, Smith,* and *Palermo.* Rules of real property law which have been established for more than thirty years and re-affirmed in three subsequent cases should not be so readily overthrown because of vague and uncertain references to "said property" in a deed.

For all of the foregoing reasons, the judgment of the trial court should be reversed and set aside and the trial court be directed to enter judgment in favor of R & R Realty Co., a corporation, and against each and all of the defendants, as prayed for in plaintiff's complaint and that all relief be denied each and all of the defendants who assert any relief against said plaintiff.

Respectfully submitted.